

EGW: USAO#2019R00425

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CASE NO.** GLS-19-3476 |
| | * | |
| **ARTHUR MORGAN,** | * | **FILED UNDER SEAL** |
| | * | |
| **Defendant** | * | |
| | * | |
| | ****** | |

ENTERED
LOGGED ___ RECEIVED

DEC 16 2019

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY

BY:

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Robert Rudolph, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a special agent with the United States General Services Administration ("GSA") – Office of Inspector General ("OIG"), assigned to the Washington, D.C. Regional Office.  My duties and responsibilities as a GSA-OIG special agent are to investigate allegations of fraud, waste, and abuse in connection with GSA's programs and operations.  I have been a GSA-OIG special agent since August 2015, and have completed the Criminal Investigator's Training Program held at the Federal Law Enforcement Training Center located in Glynco, Georgia.  I received additional training when I later attended the Inspector General Criminal Investigator Academy.  I have been trained in the preparation, presentation, and service of criminal complaints, arrest warrants, and search warrants, and I have executed both arrest warrants and search warrants in previous cases.  I have been involved in the investigation of numerous types of offenses against the United States.  I am a Certified Fraud Examiner through the Association of Certified Fraud Examiners, a professional organization that requires testing on

12/16
MM

many topics.  I hold a Bachelor's degree in accounting and a Master's degree in Banking and Financial Services Management.

2.      The facts set forth in this affidavit are based on my personal knowledge and review of records, documents, and other evidence obtained during this investigation, as well as information conveyed to me by other law enforcement officials and private persons.  All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations or were ascertained by me through the review of reports and documentary evidence.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.

3.      Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a criminal complaint and arrest warrant, it does not include each and every fact observed by me or known to the government.  I have set forth only those facts necessary to provide appropriate background and to support a finding of probable cause for the requested criminal complaint and arrest warrant.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that **ARTHUR MORGAN** ("**MORGAN**") knowingly and willfully devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud"), and for the purpose of executing and attempting to execute the scheme to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce any writings, signs, signals, pictures, and sounds, to wit, an email on or about December 8, 2015, in violation of 18 U.S.C. § 1343 (Wire Fraud).



5.      **MORGAN** runs the company Surveillance Equipment Group Inc. ("SEG") and its relevant division, SEG Armor.  A second individual, referred to herein as **Individual 1**,[1] appears also to be involved in the scheme to defraud.

## SUMMARY OF PROBABLE CAUSE

### *Program Background*

6.      The GSA is an executive-branch agency that helps manage and support the basic functioning of federal agencies.  GSA's Federal Acquisition Service serves as the acquisition and procurement arm of the federal government, offering equipment, supplies, telecommunications, and integrated information technology solutions to federal agencies.

7.      GSA's Federal Acquisition Service awards several different types of contracts, including GSA Multiple Award Schedule contracts ("GSA Schedule contracts").  These GSA Schedule contracts are indefinite delivery, indefinite quantity ("IDIQ") contracts that are available for use by federal agencies worldwide.  GSA is responsible for awarding and administering GSA Schedule contracts.  Under the GSA Schedule contract program, GSA enters into government-wide contracts with commercial firms to provide supplies and services.  Agencies place orders directly with GSA Schedule contractors.  GSA "Schedule 84" contracts include contracts for law enforcement and security equipment supplies.  Schedule 84 is entitled "Total Solutions for Law Enforcement, Security, Facilities Management, Fire and Rescue."

8.      GSA Schedule contracts are regulated by the Federal Acquisition Regulation ("FAR"), 48 C.F.R. §§ 1.000 to 53.303, which is the primary regulation for use by all federal

---

[1]      On or about November 26, 2019, I visited SEG's website located at www.segnow.com. SEG's company profile page lists **Individual 1** as an officer of SEG and mentions that **Individual 1** is originally from China; specializes in international business opportunities and partnerships between Asia and the United States, with a special focus on China; and has an ownership stake in several Chinese companies.



executive agencies in their acquisition of supplies and services with appropriated funds.  The

FAR codifies policy for federal acquisition of supplies and services.

9.      The GSA Acquisition Manual, 48 C.F.R. §§ 501.101 to 570.802, governs GSA

acquisition policies and practices, contract clauses, solicitation provisions, and forms that control

the relationship between the GSA and current or prospective contractors.

10.      All GSA Schedule contracts, including GSA Schedule 84 contracts, are subject to

the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501-2581.  The TAA requires that all

products listed on GSA Schedule contracts must be manufactured or "substantially transformed,"

19 U.S.C. § 2518(4)(B), in a "designated country," *id.* § 2511(b).  If a contractor wishes to

supply products from non-designated countries, the contractor's initial offer must specifically

identify, by contract line item, all foreign end products that are included in its offer and state

their country of origin.  A contractor's failure to do so disqualifies the contractor from eligibility

for the contract, and a contractor who falsely certifies cannot lawfully seek payment from the

United States.

11.      China is not a designated country under the TAA.  *See* FAR 52.225-5 (listing

designated countries and omitting China).

12.      Prospective contractors generally must be registered in the System for Award

Management ("SAM") database (located at SAM.gov) before the award of a contract or

agreement.[2]  When a contractor registers in the SAM database, the contractor makes a number of

representations and certifications that apply to bids it submits to the government.  According to

---

[2]      Per FAR 4.1103, "[u]nless the acquisition is exempt under [FAR] 4.1102(a), the
contracting officer . . . [s]hall verify that the offeror or quoter is registered in SAM . . . at the
time an offer or quotation is submitted."  Before 2012, the information currently reported in
SAM.gov was maintained in other databases, which would have been consulted in a similar
manner.



FAR 4.1201(b)(1), prospective contractors "are required to update the representations and certifications submitted to SAM as necessary, but at least annually, to ensure they are kept current, accurate, and complete."  Contracting officers incorporate the representations and certifications by reference in awarded contracts per FAR 4.1201(d).

13.    SAM.gov contains language stating:  "By submitting this certification, I . . . am attesting to the accuracy of the representations and certifications contained herein . . . .  I understand that I may be subject to criminal prosecution under Section 1001, Title 18 of the United States Code or civil liability under the False Claims Act if I misrepresent [company name] in any of these representations or certifications to the Government."

### *SEG and **MORGAN***

14.    During the course of this investigation, I collected and reviewed incorporation records from the Commonwealth of Virginia and learned that SEG was incorporated in Virginia on or about June 13, 1991.  The records listed **MORGAN** as the chief executive officer of SEG and listed an address located in Virginia.

15.    SEG was awarded a GSA Schedule 84 contract, No. GS-07F-0769N, on or about August 25, 2003.  The TAA is incorporated in the contract and **MORGAN** signed the contract. Additionally, **MORGAN** signed contract refresh modifications on or about June 4, 2015, February 9, 2016, and June 26, 2019.  The TAA and FAR 52.216-18(b)[3] are incorporated in these modifications.

16.    I have reviewed federal government contracting records that indicate that SEG received multiple federal government orders under GSA Schedule 84 contract, No. GS-07F-

---

[3]    Per FAR 52.216-18(b), "All delivery orders or task orders are subject to the terms and conditions of the contract.  In the event of conflict between a delivery order or task order and this contract, the contract shall control."



0769N, between 2003 and 2019, including but not limited to the orders described in further detail below.  I have selected to describe the orders below due to their association with suspected fraud on the government.

<u>*SEG's GSA Schedule 84 Contract Orders – Background*</u>

17.     In or about April 2018, the GSA-OIG initiated an investigation into whether SEG was fulfilling its GSA Schedule 84 contract orders by importing products manufactured in China.

18.     Documents related to SEG's GSA Schedule 84 contract show that SEG, through **MORGAN**, has made representations to GSA pertaining to SEG's descriptive catalogue and/or price list of items that it intended to sell to GSA customer agencies, as set forth below, that are relevant to the suspected fraud.  The GSA Acquisition Manual requires vendors to submit this information to GSA contracting personnel for evaluation before the award of a contract or contract modification.  SEG often provided GSA with its catalogue and/or price list of items in documents which included a column with the heading "COO"—*i.e.*, "Country of Origin."

19.     On or about December 11, 2014, **MORGAN** submitted SEG's authorized federal supply schedule price list, which was included as an attachment to a modification, to GSA representing that the COO for "SEG Armor – Concealable body armor IIIA," "SEG Armor – ACH Helmet-Level IIIA,"[4] "SEG Armor – Model 5401C," "SEG Armor – 5400 Front panel-IIIA," and "SEG Armor – Soft armor Back panel-5400 Panel-IIIA" was Hong Kong.  Hong

---

[4]     Once a vendor qualifies and enters into a GSA schedule contract with the government, the vendor is able to upload its price list of specific products to the GSA Advantage online portal, GSA's online shopping and ordering system.  There, photographs of products can be viewed and government purchasing officers may purchase commercial products and services directly from the vendor.  I have reviewed the GSA Advantage website located at www.GSAadvantage.gov ("GSA Advantage website").  Product SEG Armor – ACH Helmet-Level IIIA is listed with contractor part number SA-5860, which is the same product described in paragraph 37.



Kong is a designated country under the TAA. *See* FAR 52.225-5 (listing designated countries). **MORGAN** omitted the fact that the helmet and body armor appear to have originated from China, as described below in paragraphs 34-56.

20.     Based upon law enforcement's investigation, on or about May 17, 2016, **MORGAN** emailed a GSA contracting officer a copy of a letter claiming that SEG Armor products, specifically "SEG Armor – ACH Helmet-Level IIIA" and "SA-BA-5401 SEG Armor – Concealable body armor IIIA," were TAA compliant and were manufactured in the United States / Hong Kong, in response to an inquiry from that GSA contracting officer to confirm TAA compliance. **MORGAN** omitted the fact that the helmets and body armor appear to have originated from China, as described below.[5]

21.     On or about March 20, 2017, **MORGAN** submitted a spreadsheet to GSA representing that the COO for "SEG Armor" ballistic helmet "SA-5560-HC," anti-riot suit "SA-NB-RS-37," and anti-riot shield "SA-ARS-900," was the United States, specifically, Louisa, Virginia. **MORGAN** signed the modification, to add the products, on or about March 22, 2017, and the GSA contracting officer approved it on that same date. **MORGAN** omitted the fact that the helmet and riot gear appear to have originated from China, as described below.

---

[5]     Two particular SEG email addresses, including one with **MORGAN**'s nickname and initial of his surname, have been used repeatedly on contracting documents and/or correspondence with contracting personnel. Associated with the email addresses' signature block is the use of the name "Arthur C. Morgan" from SEG located at **MORGAN**'s residence in Lorton, Virginia. Law enforcement believes that **MORGAN** controls both email addresses. I previously obtained information from 1&1 IONOS, which hosts the relevant email addresses, that indicated the email addresses are registered to **MORGAN** of SEG and listed a customer address located in Lorton, Virginia. These two email addresses include the specific email address referenced below in paragraphs 38-42 (see also paragraph 44).



22.   According to documentation submitted to GSA, SEG Armor has an address listed as 4448 Mt. Airy Rd., Louisa, VA 23093.  However, on or about June 7, 2018 and November 20, 2019, I visited 4448 Mt. Airy Rd., Louisa, VA 23093.  The address, which the property records list as a residential property, did not appear to support a manufacturing operation.[6]  Specifically, no manufacturing facility was observed at the address, which appeared, from the point of my observation, to be a field and/or forested area containing several vehicles.

23.   Consistent with the requirements outlined above in paragraphs 12 and 13, SEG's SAM.gov profile includes **MORGAN**'s certifications that SEG's products are TAA compliant.  I have reviewed SEG's annual certifications and representations made in SAM from on or about March 4, 2014, through August 12, 2019.  In each of those ten submissions (on or about March 4, 2014, June 26, 2014, July 17, 2014, June 23, 2015, May 17, 2016, March 19, 2017, April 3, 2017, March 12, 2018, February 15, 2019, and August 12, 2019), **MORGAN** has not listed any end products from China and has consistently certified that SEG complies with FAR 52.225-5, "Trade Agreements," as the FAR requires:  "The offeror certifies that each end product, except those listed in paragraph (g)(5)(ii) of this provision, is a U.S.-made or designated country end product, as defined in the clause of this solicitation entitled 'Trade Agreements.'. . .  The offeror shall list as other end products those end products that are not U.S.-made or designated country end products."  FAR 52.225-6.

24.   The March 19, 2017, April 3, 2017, March 12, 2018, February 15, 2019, and August 12, 2019 certifications stated:  "I, Arthur Morgan [(**MORGAN**)], am attesting to the

---

[6]   I have reviewed databases available to law enforcement.  Although my review was not exhaustive, I have nonetheless been unable to identify any addresses associated with SEG or **MORGAN** that would appear to support a manufacturing operation for any item discussed in this affidavit.



accuracy of the representations and certifications contained herein . . . .  I understand that I may

be subject to criminal prosecution under Section 1001, Title 18 of the United States Code or civil

liability under the False Claims Act if I misrepresent Surveillance Equipment Group Inc in any

of these representations or certifications to the Government."

25.     On or about May 3, 2018, a special agent with the U.S. Army visited the GSA

Advantage website and searched for products listed under the manufacturer SEG Armor.  The

search returned approximately 23 different products SEG was offering to sell.

26.     Of particular interest to the investigation, a product photograph of SEG Armor

"SA-5560-HC" ballistic helmet listed for sale by SEG on the GSA Advantage website appeared

to the special agent to have been altered as described in this paragraph.  Specifically, a closer

visible inspection revealed the original photograph had been edited to conceal the face of a

mannequin, on which the helmet was displayed.  The pixel lines in the photograph were readily

visible, indicating photo-editing software had been applied.  A reverse image search[7] on the

internet produced the original (non-altered) image.  The U.S. Army special agent then looked for

that original image on Alibaba.com (China's analogue to Amazon.com) and saw the original

image.  Specifically, the listing associated with the Alibaba.com image in question showed the

full mannequin display, and that listing indicated that the helmet offered for sale was

manufactured by China Xinxing Import and Export Co., Ltd a.k.a. China Xinxing Shanghai

Import and Export Co. Ltd a.k.a. China Xinxing Import and Export Corporation ("CXXC").[8]

---

[7]     A reverse image search is a content-based image-retrieval query technique that compares
an image against an index of all images on the internet to retrieve the original and closely related
images, using mathematical algorithms.
[8]     According to http://www.cxxcs-china.com/About.aspx?ClassID=6, CXXC was
established in 1987, originally under the Ministry of General Logistics of the People's Liberation
Army of China, or PLA, and now belongs to the central government of China.



From these and other facts discussed below, law enforcement believes that **MORGAN** is selling the same helmet through GSA Advantage that is listed for sale on Alibaba.com as manufactured in China.

27.     Additionally, law enforcement similarly reverse image searched across the Internet a product photograph of a SEG Armor ballistic vest offered as TAA compliant on the GSA Advantage website.  That search resulted in the conclusion that the ballistic vest was also manufactured by CXXC, the same manufacturer of the aforementioned ballistic helmet.

28.     During the course of my investigation, I learned that SEG holds an account at the financial institution OAS Staff Federal Credit Union ("OAS") in Washington, D.C.  My review of records revealed that the U.S. Department of Navy and U.S. Department of State made payments to this account for contracts N0017415F0062, SES60016F0076, and SINLEC17F0027 (see paragraphs 34-63), during 2015, 2016, and 2017.  The total value of these contracts was approximately $380,627.73.

29.     On or about November 30, 2018, I received shipping records involving SEG from U.S. Customs and Border Protection.  The records indicate that from on or about October 9, 2015, to May 30, 2017, SEG received a total of approximately 14 shipments, comprised of either vests or helmets, from CXXC in China.  SEG received shipments from China which pertain to the time periods of U.S. Navy orders FGAKV9308F and N0017415F0062, and U.S. Department of State orders SES60016F0076 and SINLEC17F0027, described below in paragraphs 34-63.  Shipments were sent to SEG and/or **MORGAN** at 9435 Lorton Market St., Lorton, Virginia, a UPS store.  On or about November 28, 2018, the owner of the UPS store located at 9435 Lorton Market St., Lorton, Virginia, confirmed that **MORGAN** had a mailbox at that location and stated that **MORGAN** checked on the mailbox several times per week.



30.     From on or about October 9, 2015, to May 30, 2017, the shipping records do not indicate that SEG received shipments of vests or helmets from any country other than China.

31.     I reviewed a federal contracting database and learned that between on or about September 14, 2015, and July 15, 2019, approximately five federal government agencies placed approximately nine orders, comprised of ballistic vests or helmets or riot gear, from SEG.  The total value of these orders was approximately $639,921.11.  I believe, from my review of records, that SEG was paid for performance on most of these orders.  I describe certain orders below.

### *Federal Bureau of Investigation Reporting*

32.     On or about September 12, 2018, **MORGAN** told Federal Bureau of Investigation ("FBI") special agents in a consensual interview that he could not export body armor from China but could import it from Hong Kong.  It was an FBI special agent's impression that **MORGAN** was conveying that he "could" or "could not" take those actions in that it was legal to export armor and helmets from Hong Kong but not directly from China.  **MORGAN** stated that he had exported both helmets and body armor in the past; he did not specifically state who the end user was.

33.     On or about November 19, 2018, **MORGAN** told FBI special agents in a consensual interview that he had purchased 11 acres of land in Louisa, Virginia, where he hoped to build a manufacturing facility.  **MORGAN** claimed that he was preparing the area for habitation and facility construction at that time.  Law enforcement identified a 10.93-acre property that **MORGAN**'s wife purchased in Louisa, Virginia, in or about January 2016, which in 2018 through November 2019 has not appeared to sustain any manufacturing facility.  I mentioned this property above in paragraph 22.

11



*U.S. Navy Order FGAKV93082F*

34.     On or about August 2, 2015, the U.S. Navy placed order FGAKV93082F with

SEG (under the GSA Schedule contract GS-07F-0769N) for $2,618.45 to provide seven "SA-

5401BA" ballistic vests to Navy Munitions Command, Bahrain.  The models SEG provided to

the U.S. Navy were "5401C, 5400B, and 5400F."  A review of import data revealed that

**MORGAN** received an import of vests which pertain to the time period of U.S. Navy contract

FGAKV93082F.  "Sample for Safety Vest" was listed as the "Bill – Cargo Desc" for an import

which occurred on or about October 9, 2015.  The "Bill – Shipper Name" was listed as CXXC,

Beijing, China, and the "Bill-Weight" was listed as 49.04 kilograms ("KG").

35.     In and around November 2019, I reviewed SEG's OAS bank account statements.

On or about August 21, 2015, SEG made a payment to CXXC in the amount of $1,050.  In

October 2019, I reviewed PayPal account information associated with SEG and **MORGAN**.

SEG received a payment for this order from a representative of the U.S. Navy on or about

August 24, 2015.

36.     On or about November 14, 2018, a special agent with the Naval Criminal

Investigative Service examined one of the ballistic vests received from the U.S. Navy provided

by SEG under U.S. Navy order FGAKV93082F.  The serial number listed on the ballistic vest is

CXXC-SEG201509.

*U.S. Navy Order N0017415F0062*

37.     On or about September 14, 2015, SEG was awarded U.S. Navy order

N0017415F0062 (under the GSA Schedule contract GS-07F-0769N) for $319,059.88 to provide

1,528 "Model 5860 ACH" level IIIA ballistic helmets to the Naval Surface Warfare Center

Indian Head Explosive Ordnance Disposal Technology Division ("NSWC IHEODTD"), Indian



Head, Maryland.  The delivery date for the order was listed as November 15, 2015, but an extension was granted to February 29, 2016, as explained below.  A review of import data revealed that **MORGAN** received three imports of helmets which pertain to the time period of U.S. Navy contract N0017415F0062.  "Safety Helmet," "Safety Helmet~S 63," and "Safety Helmet~S 92" were listed as the "Bill – Cargo Desc" for three imports which occurred on or about November 6, 2015, January 9, 2016, and February 21, 2016, respectively.  The "Bill – Shipper Name" was listed as CXXC, Beijing, China, and the "Bill-Weight" was listed as 4.5 KG for November 6, 2015, 921 KG for January 9, 2016, and 1240 KG for February 21, 2016.

38.     Based upon my investigation, on or about December 8, 2015, **MORGAN** emailed U.S. Navy contracting personnel located in Indian Head, Maryland, in response to numerous inquiries regarding SEG's inability to meet the agreed upon delivery schedule.  In the email, **MORGAN** wrote, in part:

> When we won the award in 9/14/2015 - we immediately placed an order with our Spectra PE material supplier for 500 rolls of the PE material that is used in the manufacturing of the helmet order.
> . . .
> We have been manufacturing 615 medium helmets . . . .
> . . .
> We understand the urgency for this order, we are doing our best.  As you may be aware every US supplier of any type of Ballistic resistant material is back logged. We will personally transport the order to you directly as soon as they are ready, as our factory is in southern Virginia, so it will be a local delivery.

39.     On or about December 11, 2015, **MORGAN** again emailed U.S. Navy contracting personnel.  In the email, **MORGAN** wrote, in part:

> I understand your concerns, I have just returned to my office this morning. (I was on visiting another facility OCONUS).  You are correct, I should have contacted you when I was informed of the back order issue, ( I too learned about it, after the fact) and I apologize for that, we are making every effort to produce and deliver the order as fast as we can , without compromising the quality of the product. I will follow up with you on some hard dates by Monday.
> I appreciate your understanding in this matter.

13



40.     On or about December 13, 2015, **MORGAN** again emailed U.S. Navy

contracting personnel.  In the email, **MORGAN** wrote, in part:

> I have thought about the current situation, all this weekend.
> As I stated in the last correspondence, we are working to complete the 1st. run of
> 615 helmets ready with in the next 2 weeks and the hope to have the remaining
> 610 Large, 153 Small, and 150 X-Large by end January.
> Since we have the Holidays approaching, and to anticipate any future additional
> unforeseen delays, I respectfully request an additional 60 day extension.
> We fully anticipate that we will have completed the order way before that time,
> but it would provide us the insurance of continuance without any potential future
> default. . . .

41.     On or about December 14, 2015, **MORGAN** again emailed U.S. Navy

contracting personnel.  In the email, **MORGAN** wrote, in part:

> My misunderstanding, we request a closing date by 01/31/2016. . . .

42.     On or about January 20, 2016, **MORGAN** again emailed U.S. Navy contracting

personnel.  In the email, **MORGAN** wrote, in part:

> We need to ask for one more extension, so we may be able to complete the order.
> . . .
> This delay is due to the late production start, due to the original back order for the
> materials needed to produce the product, and the past holiday season.
> We are in the middle of production for the balance of the order.  I erred in my
> original EST of delivery of 01/31/2016.
> We are requesting 1 additional and final extension of 02/28/2016 for the deadline
> delivery.
> I apologize for this delay, we are doing everything possible to complete this order
> as fast as possible.

43.     I have reviewed the contracting documents and correspondence with contracting

officials for multiple orders awarded to SEG.  I have also communicated directly with

representatives from the U.S. Navy in connection with the emails **MORGAN** sent on or about

December 8, 2015, December 11, 2015, December 13, 2015, December 14, 2015, and January



20, 2016, regarding order N0017415F0062.  The contract specialist **MORGAN** emailed was located on base in Indian Head, Maryland, when she received each of these five emails.

44.     In or about November 2019, I obtained information from 1&1 IONOS, the host for **MORGAN**'s SEG email addresses, including the email address used to send these five emails (see paragraphs 38-42).   1&1 IONOS indicated that its email servers were, in December 2015 and January 2016, and have remained, in Lenexa, Kansas, and that all emails for a 1&1 Internet Inc. email account would have gone through those servers.   1&1 IONOS controls the 1&1 Internet Inc. email accounts, which include the SEG email addresses discussed herein. From this, I believe there were interstate communications of information necessary for SEG to obtain, complete, and secure payment on federal government contracts, pursuant to his scheme to defraud, which traversed Kansas and terminated in Indian Head, Maryland.

45.     On or about January 3, 2019, I inspected one of the ballistic helmets SEG provided under U.S. Navy order N0017415F0062.  After removing the inside rubber liner of the helmet, a closer visible inspection revealed handwriting on the ballistic material, which appeared to be Chinese characters and in Mandarin (based upon my consultation of an individual familiar with Mandarin), as follows:





46.     Based upon my review of SEG's OAS bank account statements, SEG received a partial payment for U.S. Navy order N0017415F0062 from the Defense Finance and Accounting Service ("DFAS") on or about February 16, 2016 in the amount of $127,069.60.  On or about the same day, February 16, 2016, SEG made a payment to CXXC in the amount of $67,915.  On or about February 18, 2016, SEG made a payment to **Individual 1** in the amount of $42,000.  SEG received the second partial payment for U.S. Navy order N0017415F0062 from DFAS on or about March 10, 2016 in the amount of $191,990.28.  On the same day, March 10, 2016, SEG made a payment to **Individual 1** in the amount of $43,000.

47.     In reviewing emails pursuant to a search warrant in this matter, I saw that on or about February 23, 2016, **MORGAN** emailed an apparent representative of CXXC at the domain cxxc-china.com, and copied on that email, **Individual 1**.  The subject of the email was "Fwd: RE: Re: Fwd: wire to China 2/16 $67,915."  In the email, **MORGAN** wrote, in part:

16



> Hi Henry:
> Here is the correspondence from our Bank Branch Manager
> she assured me, that funds were transferred into your bank.
> the wire should clear your account with in the next day or so.

### *U.S. Department of State Order SES60016F0076*

48.     On or about June 6, 2016, SEG was awarded U.S. Department of State order

SES60016F0076 (under the GSA Schedule contract GS-07F-0769N) for $12,917.85 to provide

36 "SA-5401BA" ballistic vests to the U.S. Embassy in San Salvador, El Salvador (a

procurement for the U.S. Navy).  According to a review of SEG's OAS bank account statements,

on or about July 6, 2016, SEG made a payment to CXXC in the amount of $5,616.

49.     On or about July 23, 2016, **MORGAN** emailed a representative of CXXC at the

domain cxxc-china.com and **Individual 1**.  The subject of the email was "Next Order."  In the

email, **MORGAN** wrote:

> Hi Henry:
> We need to get the 2nd order completed, client is asking for shipping dates.
> We will ship through your air freight or Transpec.

50.     On or about July 25, 2016, the same CXXC representative mentioned above

replied to **MORGAN** and **Individual 1**.  In the email, the CXXC representative wrote, in part:

> Dear Art,
> Thank you for your email for your following up of the 36pcs Black vest.
> Just now I confirmed with our Military License Dept., the Export License will be
> issued next week on Wednesday or Friday . . . .
> and our products will be finished on next Monday, so the soonest estimated
> delivery time will be next week.
> Sorry to let you wait, on this Friday or Saturday, once we finish the production, I
> will take the photos for you first.
> Then we will wait for the license to export, we will push the license if we can get
> it sooner.  Sorry Art, to export based on the License is our policy.

51.     On or about August 9, 2016, **MORGAN** emailed a representative of Transpac

Services Inc.  In the email, **MORGAN** wrote, in part:



here is the invoice and Packing list for Customs clearance, Please let me know if
you need any additional documents . . . .

The invoice **MORGAN** provided was from CXXC in China and was for 36 safety vests

**MORGAN** purchased for $5,616.  The contract number listed on the invoice was

16Y07B12.  The invoice listed the "Port(Station) of Dispatch" as "Beijing,CHINA."

52.     A review of import data revealed that on or about August 10, 2016, SEG received

a shipment of "Safety Vest" as described in the "Bill – Cargo Desc" section of the import data,

which weighed 104 KG.  The "Bill – Shipper Name" was listed as CXXC, Beijing, China.

53.     On or about August 26, 2016, **MORGAN** emailed U.S. Navy personnel located in

El Salvador to provide SEG's bank account information for order SES60016F0076.

54.     On or about September 6, 2016, the U.S. Embassy in San Salvador received 36

model "5401C, 5400B, and 5400F" ballistic vests from SEG in fulfillment of U.S. Department of

State order SES60016F0076.

55.     According to a review of SEG's OAS bank account statements, SEG received a

payment for U.S. Department of State order SES60016F0076 from the U.S. Department of State

on or about September 15, 2016 in the amount of $12,917.85.

56.     On or about October 4, 2018, a special agent with the U.S. Department of State

Office of Inspector General examined one of the ballistic vests received from the U.S. Embassy

in San Salvador that SEG had provided under order SES60016F0076.  The serial number listed

on the ballistic vest was 16Y07B12, which matches the contract number described above in

paragraph 51.

### *U.S. Department of State Order SINLEC17F0027*

57.     On or about April 11, 2017, SEG was awarded U.S. Department of State order

SINLEC17F0027 (under the GSA Schedule contract GS-07F-0769N) for $48,650 to provide 120



"SA-5560-HC" ballistic helmets to the U.S. Embassy in Tegucigalpa, Honduras.  These were the

ballistic helmets that were subject to the reverse image match described above in paragraph 26.

58.     On or about April 11, 2017, the same day SEG received the award from the U.S.

Department of State, **MORGAN** emailed **Individual 1**.  The subject of the email was "New

Order for Henry."  In the email, **MORGAN** wrote, in part:

> Hi Sam:
> We just won a 120 helmet order for State Dept.
> I will call you on wechat this evening . . . .

"Henry" is the name of the apparent representative of the Chinese company mentioned above in

paragraph 47.

59.     On or about May 4, 2017, **MORGAN** emailed U.S. Embassy personnel in

Tegucigalpa, Honduras, in response to an inquiry regarding the delivery of the helmets.  In the

email, **MORGAN** wrote, "[w]e anticipate delivery by the end of the month, we are already in the

process of producing them."

60.     On or about June 2, 2017, **MORGAN** again emailed U.S. Embassy personnel in

Tegucigalpa, Honduras, and wrote:  "[m]y apology for the delay, Memorial Day holiday delayed

the our [sic] shipping time line.  We are preparing the order for shipment now . . . ."

61.     A review of the import data revealed that on or about May 30, 2017, Morgan

received a shipment of "Safety Helmet," as described in the "Bill – Cargo Desc" section of the

import data, that weighed 232 KG.  The "Bill – Shipper Name" was listed as CXXC, Beijing,

China.

62.     On or about June 12, 2017, SEG shipped 120 "SA-5560-HC" ballistic helmets,

which weighed 232 KG, to the U.S. Embassy in Tegucigalpa, Honduras, in fulfillment of U.S.

Department of State order SINLEC17F0027.  When the shipment was received by the U.S.



Embassy in Tegucigalpa, Honduras, the shipper's name and address appeared as SEG with an address listed of 9435 Lorton Market St., Suite 711, Lorton, VA 22079.  There was no accompanying disclosure that the helmets originated from China.  **MORGAN** emailed the invoice for this order to the U.S. Department of State located in Washington, D.C.

63.    According to a review of SEG's OAS bank account statements, SEG received a payment for U.S. Department of State order SINLEC17F0027 from the U.S. Department of State on or about August 15, 2017 in the amount of $48,650.  On or about August 17, 2017, SEG made a payment to CXXC in the amount of $7,740.  On or about August 22, 2017, SEG made a payment to **Individual 1** in the amount of $20,000.

<u>*U.S. Department of State Order 19MX9019F0025*</u>

64.    On or about July 15, 2019, SEG was awarded U.S. Department of State order 19MX9019F0025 (under the GSA Schedule contract GS-07F-0769N) for $118,765 to provide riot gear, including but not limited to "SA-NB-RS-37" anti-riot suits and "SA-ARS-900" anti-riot shields, to the U.S. Embassy in Mexico City, Mexico.

65.    On or about July 31, 2019, **MORGAN** emailed U.S. Department of State contracting personnel in response to an inquiry regarding the country of manufacturing of the riot gear.  In the email, **MORGAN** wrote, in part:

We are offering US made products . . . .

66.    On or about June 14, 2019, **MORGAN** emailed "Henry."  The subject of the email chain was "Re:New Opportunity."  In the email, **MORGAN** wrote, in part:

Hi Henry:
My apology for not keeping in touch, it has been slow.
We have a new RFQ for Riot Gear.
Please review and provide me with price and Delivery schedule . . . .



On or about June 16, 2019, "Henry" at the domain 163.com emailed **MORGAN** and **Individual**

**1**. The subject of the email was "Re:New Opportunity."  In the email, "Henry" wrote, in part:

> Dear Art,
> Good morning!
> Kindly find attached our ref. quotation.
> Any question, please free to let me know! . . . .

67.     I performed a comparison of the previously mentioned quotation and the

ProForma invoice SEG submitted to the U.S. Department of State.  The quotation and the

ProForma invoice both contain the same quantity of riot suits, riot helmets, and riot shields.

### SEG Email Correspondence regarding Chinese Origin

68.     In reviewing emails pursuant to a search warrant in this matter, I saw that on or

about May 8, 2017, **MORGAN** emailed a representative of a Bolivian company.  The subject of

the email was titled, "Re: Chinese origin."  In the email, **MORGAN** wrote, in part:

> Dear Jamie:
> It appears to me that if you wish to be selling security products and services to
> your government on a long term basis, as you have indicated, you need to
> implement a more creative and dynamic strategy to be able to overcome all the
> political and bureaucratic obstetrical (sic) that you are encountering. In my
> opinion you need to be willing to invest a little money and learn to "think out of
> the box."
> Key issue -"Origin of goods"
> Solution - Open a Warehouse office in Buenos Aires. We will ship our goods to
> you there. We support you with OEM and private labeling and guarantee the
> highest of quality.
> You brand them as a Comtec product , manufactured in Argentina.
> You sell them direct to the Government
> From that point on all you products are manufactured in Argentina.
> Banking - setup a Comtec Bank Account in Buenos Aries - moving money around
> from Argentina is much easier than Bolivia.
> 3- Recommendations
> 1- HSBC Argentina
> 2.- Deutsche Bank Argentina
> 3. CitiBank . . . .



69.     On or about May 8, 2017, **MORGAN** again emailed the representative of the

Bolivian company.  In the email, **MORGAN** wrote, in part:

> Hey Jaime:
> what you fail to understand, all the competition is also selling Chinese, no matter
> who the location of the company is.
> the Mexican company is also selling Chinese, he is offering  cheaper ,because he
> will be selling lower quality - that cosmetically looks the same.
> We can sell cheaper too, if you want to sell cheaper quality.
> If you recall in our earlier conversation we were going to sell you and you were
> going to present it as a Comtec product.
> You need to play the same game that everyone else is.
> You say we have won the helmets & the shields - if that is confirmed , I will
> reduce the order another $50,000.00 if you can guarantee that we have that order
> locked in.
> We can worry about other thins as we progress . . . .

## CONCLUSION

70.     Based on the forgoing, I submit there is probable cause to believe that **MORGAN**

violated 18 U.S.C. § 1343 (Wire Fraud) when, on or about December 8, 2015, in furtherance of

his scheme to defraud, **MORGAN** sent an interstate wire, specifically an email, that traversed

Kansas and terminated in the District of Maryland in furtherance of the scheme to defraud

outlined herein.  I therefore request that the Court issue the proposed criminal complaint and

arrest warrant in this case.

Respectfully submitted,

_____

Robert Rudolph, Special Agent
U.S. General Services Administration
Office of Inspector General

Subscribed and sworn to before me on 16th of December, 2019

_____
THE HONORABLE GINA L. SIMMS
UNITED STATES MAGISTRATE JUDGE