IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. GJH-20-171 |
| | * | Criminal No. GJH-20-368 |
| ARTHUR CHESTER MORGAN, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*

<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>

**INTRODUCTION**................................................................................................1

**BACKGROUND** ................................................................................................3

    **I.**    **Factual Background**…………………………………….............................................3

    **II.**    **Advisory Sentencing Guidelines Calculation**……………………………......11

**ARGUMENT** ....................................................................................................12

    **I.**    **The Section 3553(a) Factors and the Government's Recommended Sentence** ....12

    **II.**    **The Loss Amount Associated with Defendant's Fraud Conviction Is At Least $658,866.92, and, Specifically, At Least $673,099.92**……………………………17

    **III.**    **The Government Is Entitled to Restitution in the Amount of $488,976.92, the Sum Paid to Defendant for the Orders and the Agencies' Resulting Harm**……… .....29

    **IV.**    **Defendant Must Forfeit $488,976.92, the Proceeds Defendant Obtained Directly from Wire Fraud**……………………………….............................................32

**STATEMENT AS TO RESTITUTION, WITNESSES, AND LENGTH OF HEARING** ....36

**CONCLUSION** ...................................................................................................36

**INTRODUCTION**

      The government respectfully submits this memorandum in anticipation of the sentencing

of the defendant, Arthur Morgan ("Defendant"), in the two federal criminal cases against him.

During at least five years of a procurement relationship with the federal government, Defendant disregarded his obligation to provide properly sourced equipment—including sensitive and potentially life-sustaining items such as ballistic vests, helmets, and shields—to federal defense and diplomatic agencies under multiple orders.  Having illegally sourced these goods from China, Defendant doubled-down on the lie that they properly originated from the United States or "designated" countries by continuing that misrepresentation in emails and use of falsified labeling to convey that the products had *not* been made in China.  Furthermore, although Defendant has been long prohibited from possessing firearms, ammunition, or body armor due to a conviction for second-degree murder (among other prior convictions)—where he shot and killed a man and shot his then-wife in the chest—law enforcement discovered multiple of each (including four firearms and more than 300 rounds of ammunition) upon searches in 2019.

The government anticipates that it will request a sentence of 37 months, which is at the high end of the applicable U.S. Sentencing Guidelines ("Guidelines") range of 30 to 37 months' imprisonment and is separately demanded by the factors under 18 U.S.C. § 3553(a).  Defendant's behavior not only endangered his community but also denigrates trust in the critically important supply chain for defense equipment to American service-members and their foreign partners.  As a contractor, it was not his role to supplant U.S. foreign policy or trade-agreement decisions, nor to provide to the government products they did *not* want and cannot use.  Defendant receives credit for his acceptance of responsibility through his guilty pleas, and a sentence of 37 months' imprisonment is appropriate given the nature and circumstances of the offenses, Defendant's history and characteristics, and the need to accomplish the purposes of sentencing.  A lesser sentence would fail to promote respect for the law, provide just punishment, or deter Defendant and others from committing similar crimes.

In addition to the term of imprisonment, the government respectfully requests restitution of the funds government agencies paid to Defendant for the illegally-sourced products.  They are value-less to the government, at best.  Further, the government will request forfeiture in the same amount as restitution, because the funds the government paid to Defendant represent the direct proceeds of his criminal behavior and Defendant's ill-gotten gains.

## BACKGROUND

### I.      Factual Background

During the time period at issue in this case, Defendant was the Chief Executive Officer of Surveillance Equipment Group, Inc. ("SEG").  (Stipulation of Facts ("SOF") at 3; Pre-sentence Investigation Report ("PSR") at 7.)  Though SEG, Defendant received a Schedule 84 contract from the General Services Administration ("GSA"), to provide various government agencies with law enforcement and security equipment supplies.  (SOF at 3; PSR at 6, 7.)  Under relevant provisions of the Trade Agreements Act ("TAA"), Schedule 84 contractors such as Defendant are prohibited from sourcing their goods from countries not "designated" pursuant to the TAA. *See* 19 U.S.C. §§ 2501-2581.  China is not a "designated" country.  (*See* SOF at 2; PSR at 7.)[1]

The TAA's terms prohibiting sourcing from China were explicitly included in Defendant's contract.  (*Id.*)  Defendant also signed contract refresh modifications in 2015, 2016, and 2019, *e.g.*, again reincorporating the TAA prohibition.  (SOF at 2-3; PSR at 7.)  There is ample additional evidence he understood the nature of the obligations imposed upon him, as

---

[1]      The Congressional purposes of the TAA included a number of fair-trade and quality-control ones:  "(1) to approve and implement the trade agreements negotiated under the Trade Act of 1974; (2) to foster the growth and maintenance of an open world trading system; (3) to expand opportunities for the commerce of the United States in international trade; and (4) to improve the rules of international trade and to provide for the enforcement of such rules, and for other purposes."  19 U.S.C. § 2502.

well:  in ten certifications between 2014 and 2019 through the System for Award Management ("SAM"), Defendant repeatedly confirmed that his products complied with the TAA.  (SOF at 3; PSR at 7-8.)  Furthermore, Defendant failed to list any products sourced from non-designated countries when prompted by the SAM to do so.  (*Id.*)  In each certification, Defendant acknowledged that non-compliance would expose him to criminal prosecution.  (*Id.*)

Despite his repeated assurances of compliance with the TAA, Defendant knowingly and repeatedly violated the requirement that Schedule 84 goods be sourced from designated countries—and beyond that, he repeatedly, specifically represented (falsely) that his company was manufacturing the relevant products at its (non-existent) facility in Virginia.  (SOF at 3-4.) Between 2014 and 2019, six government agencies placed at least eleven orders with Defendant for ballistic vests or helmets or riot gear that were part of this scheme.  (SOF at 4; PSR at 8.) The total value of these eleven orders was at least $658,866.92, of which Defendant was paid at least $488,976.92 (through SEG, for which Defendant was the sole signatory).  (SOF at 4; PSR at 8-9.)  The eleven orders are summarized in the table below.  (*See* SOF at 4-8; PSR at 9-13.) Contrary to the requirements of the contract, the TAA, and Defendant's representations, the goods in each of the orders originated in China.  (*Id.*)

| Agency | Order No. | Description | Amount |
|---|---|---|---|
| U.S. Coast Guard | HSCG3314FSER007 | 10 ballistic vests | **$9,628.50** |
| U.S. Navy | FGAKV93082F | 7 ballistic vests | **$2,618.45** |
| U.S. Navy | N0017415F0062 | 1,528 ballistic helmets | **$319,059.88** |
| U.S. Department of State | SES60016F0076 | 36 ballistic vests | **$12,917.85** |
| U.S. Department of State | SINLEC17F0027 | 120 ballistic helmets | **$48,650.00** |
| U.S. Army | W912KN17F0064 | 46 ballistic helmets | **$18,421.63** |
| U.S. Air Force | FA524018F0058 | Ballistic helmets | **$71,356.05** |
| U.S. Marine Corps | M0068118F0273 | Ballistic vests | $35,905.00 |
| U.S. Department of State | 19MX9019F0025 | Riot gear | $118,765.00 |
| U.S. Army | W91QF019F0034 | 4 ballistic shields | **$6,324.56** |
| U.S. Army | W912GY19F0055 | 64 ballistic plates | $15,220.00 |

**Bolded** amounts above were paid to SEG, as described in the SOF, totaling the above-listed

**$488,976.92**.  (*Id.*)  The total value of the contracts derives from all the numbers, **$658,866.92**. Defendant sourced his products from at least three different Chinese companies, and mis-labeled and re-shipped them in supposed fulfillment of the agencies' orders.  (*E.g.*, SOF at 6-7.)

As an example of Defendant's misrepresentations about the origin of his products in communications with government officials—and showing how central he knew the products' origin was—Defendant corresponded with contracting personnel in Indian Head, Maryland, about a delivery delay under Order No. N0017415F0062 and stated, "We have been manufacturing 615 medium helmets . . . .  As you may be aware every US supplier of any type of Ballistic resistant material is back logged."  (SOF at 4; PSR at 9-10.)  When corresponding with his Chinese supplier regarding the goods provided under Order No. W912KN17F0064, Defendant specifically requested that the labels affixed to the product say "Louisa, Va." instead of "Made in China."  (SOF at 6; PSR at 11.)  Defendant stated in an email about Order No. 19MX9019F0025, to a Department of State contact, "We are offering US made products[.]"  (SOF at 6; PSR at 12.)  Defendant's emphasis on these points showcases his knowledge that the orders, in fact, hinged on U.S. or designated origin products, *i.e.*, not sourcing from China.

Although the government was not obligated to test any products, the primary testing conducted showed that the products in that order were *not* fit for use.  Specifically, with respect to the 36 ballistic vests destined for the U.S. Embassy in San Salvador, El Salvador, (*see* SOF at 6), the testing determined deficiencies in size and labeling, *e.g.*:  "[T]he tested vests did not meet the NIJ level IIIA size standards.  Additionally, NIJ standards required ballistic vests to be uniquely serialized.  The vests sold tested were all labeled with the same serial number." (Exhibit 1 at 1, 4.)  As the testing report further found as to certain articles, the ballistic panel "DOES NOT MEET NIJ SIZE REQUIREMENT TEMPLATE," (Exhibit 1, at 5, 6, 7, 8, 9, 10,

11, 12), and was even secured simply by "packing tape," (*id.*).  Accordingly, while the particular ballistic plate might have stopped a bullet, it might not have stopped it in the correct place—which could be equally fatal.  The vests were also each different, rather than being any standard or reliable product at all:  for instance, with weights ranging from 2.55 to 3 pounds even simply on a small number of samples.  (*Id.* at 2.)  Notably, Defendant's advertising of the vests reflected not only that they were NIJ compliant but also that each weighed 4 pounds.  (Exhibit 2.)

These negative results were consistent with the experience of soldiers in the field—in a very dangerous area due to MS-13 and other circumstances, for example.  (Exhibit 3.)  Indeed, the vests had already been retired from use as deficient by the time they were sought for testing. (*Id.* at 2.)  The U.S. Navy ("USN") Masters at Arms, in fact, "stopped using the vests in October 2017 because they were not comfortable . . . and were not meeting the USN's mission needs." (*Id.*)  Notably, these vests were sourced from Company 1, the same source as for multiple other contracts, *including* the two orders for which items may still be in use by foreign government partners despite the U.S. agencies' efforts—Order No. N0017415F0062 totaling $319,059.88, and Order No. SINLEC17F0027 totaling $48,650, as described below—heightening the government's diplomatic and security concerns based on Defendant's conduct.  (SOF at 4-6.)

Other issues were noted with vests, as well.  For example, as described by a U.S. Marine Corps Captain who received the vests slated for Yuma, Arizona (Order No. M0068118F0273), issues with respect to the vests—other than their two-months-late arrival which caused the Marines to have had to use expired vests or switch-off vests which caused diminished morale and distinct concern (and gratitude that there were no shootings)—included:  (1) the vests did not have removable straps, as required by the contract, and which was necessary because, among other reasons, overstretched material "would fray over time and the vests wouldn't cover vital

areas of the body when straps got older;" (2) "the manufacture date on the vests was four days after the issue date;" (3) "the serial numbers were the same on all vests;" (4) "the level of protection indicated on the panel didn't match what was required in the contract;" and (5) "the carrier was not made of a breathable material," which was a specific concern because "it gets very hot in Arizona." (Exhibit 4.)  Accordingly, "[w]hen the SEG vests were received, they were not issued to the Marines because of these concerns with them.  There was a shortage of vests because of this and they had to go and order a completely new set of vests with another vendor months later.  They would not have selected SEG if they had information indicating the vests were manufactured in China; they would have been concerned with the quality of the product and whether it met the ballistic requirements." (*Id.* at 1-2.)  In addition, given the nature of the specific operations at that base, "there would be issues with any equipment coming on base from China." (*Id.* at 2.)  The Captain further has indicated that it cost the facility $50,138 to receive 100 vests after the contract with SEG was terminated.  (Exhibit 5.)

(Based on the above, the government certainly contests Defendant's self-serving assertions in response to the PSR that the Chinese equipment Defendant provided—as to which the government has not reviewed any confirmatory testing that Defendant claims exists—was adequate or what the government bargained-for in any respect.  (PSR at 15.)  Quite the contrary. Further, additional testing was not generally conducted; that was not an obligation on the government and unnecessary expenses such as that would only add to the losses in this case.)

Consistently with their known deficiencies and unacceptable origin, during the time period of the investigation all of the illicit goods from Defendant mentioned above that remain in U.S. possession were taken out of use (if they had not been already) and are being held as evidence.  All of the goods currently held will be destroyed or returned to Defendant (or a

qualifying designee, given his disqualifying criminal history for possession of body armor, *e.g.*) after the conclusion of these criminal proceedings.  In the case of two orders, the products were provided to foreign security partners of the United States, and have not yet been re-secured, despite the government's requests.  Namely, as to Order No. N0017415F0062, totaling $319,059.88, six of 28 helmets were secured but the rest remain in the possession of Kyrgyzstan forces; and 1,500 helmets remain in the possession of Pakistani forces.  As to Order No. SINLEC17F0027, totaling $48,650, four of 120 helmets were secured but the rest remain in the possession of Honduran forces.  The portion of the products that remain in the custody of the United States' partners would be destroyed or returned to Defendant (or qualified person) if/when they are recovered.  Even if products were not mislabeled with Defendant's false origin information (which he insisted to include) or otherwise, they cannot be legally used by any government entity due to the TAA.  That is true even if there could be any positive view about their quality (which there is not).

On December 17, 2019, investigators searched Defendant's home; Defendant's wife's vacant property in Louisa, Virginia, which Defendant had claimed housed his manufacturing operation; and two of Defendant's storage units—including one storage unit where he had been in the process of repackaging the goods most recently received from China to ship, relabeled as coming from the United States, in support of another government order.  (SOF at 7; PSR at 13.) Notably, even after his arrest and having been told that the products destined for the last government contract had been seized, when he was incorrectly told otherwise by his wife, he enlisted his wife and employee to try nonetheless to ship them in supposed fulfillment of the

contract (and despite having acknowledged to his wife that he was not supposed to have contact with the employee), *from jail on the fraud scheme.* (SOF at 7-8.)[2]

The government recovered four firearms (which Defendant's wife had asked him to remove from the house, and he had not, (*see* PSR at 16)), more than 300 rounds of ammunition, five ballistic vests, five ballistic plates, and three ballistic helmets, in addition to the items slated for fraudulent shipment under the most recent order. He possessed three handguns (two of them semi-automatic) in his home office on the date of his arrest, each accompanied by corresponding ammunition, despite his prior felony convictions. At the time Defendant possessed the multiple firearms, ammunition, and body armor, he knew he had been convicted for violent felonies of

---

[2]      The government is not seeking an obstruction of justice enhancement based on Defendant's conduct, *see, e.g.*, U.S.S.G. § 3C1.1, Application note 4(D) (referring to attempted destruction or concealment of evidence as warranting the enhancement), but it is certainly relevant to Defendant's history and characteristics and counsels towards the recommended sentence. *See, e.g.*, *United States v. Almeida*, 748 F.3d 41, 46 (1st Cir. 2014) (affirming application of the obstruction of justice enhancement under U.S.S.G. § 3C1.1, on the basis of phone calls the defendant placed to his wife from jail, telling her to "[t]hrow all my shit – all my shit needs to be thrown away"); *United States v. Hankins*, 127 F.3d 932, 934 (10th Cir. 1997) (same, based on the defendant's efforts to have "cash removed from [a] storage facility" by calling his sister to request that); *United States v. Pridgen*, 623 F. App'x 62, 64 (4th Cir. 2015) (same, after the defendant "placed several telephone calls to his girlfriend, attempting to establish a false alibi" and get her to claim ownership of or dispose of other evidence). *See also United States v. Black*, 636 F.3d 893, 901 (7th Cir. 2011) (rejecting a challenge to the enhancement on the grounds that the defendant's effort to obstruct justice was a "futile act because the FBI had already retrieved that evidence before he attempted to hide it," with the observation that courts "do not reward defendants for failed attempts to obstruct justice").

      Notably, moreover, Defendant's pushing the limits of what he could get away with was not isolated to that conduct. Defendant attempted to stare down law enforcement witnesses against him in the courtroom during a detention hearing after the magistrate judge indicated her inclination to release him, such that he had to be admonished twice by a Deputy U.S. Marshal to desist. He continued combative and disrespectful conduct towards his supervising Pre-trial Services officers despite multiple admonishments during the course of his release; immediately violated those conditions by walking his dog around the neighborhood despite repeated directives not to; and continued prohibited contact with a witness, the employee mentioned above, as well. (*See, e.g.*, ECF Nos. 31, 36, 48, 60, 69.) Having been released based in notable part upon claimed risk of exposure to COVID-19, he was not returned to jail—but none of these incidents instills any confidence about his willingness to behave appropriately in future.

Second Degree Murder; Assault with the Intent to Murder, Rape or Rob; and Use of a Handgun in a Crime of Violence.  (SOF at 9; PSR at 14.)  Indeed, his criminal history includes bothg firearms-related convictions and that murder conviction from an incident where he shot his prior wife in the chest (who managed to survive) and someone with her (who did not).  (PSR at 20.)

Specifically, Defendant's criminal history, even if dated (which means he receives only a single criminal history point), has been uniquely violent and disturbing, including persistent misconduct involving firearms.  It includes not only murder, as mentioned above, for which he was sentenced initially to 30 years' imprisonment (although he was released *much* earlier), but also assault with intent to maim before then, and both illegally carrying a firearm and possession of explosives (wherein he was also charged with violation of probation and a drug offense) separately before.  Defendant was also convicted of interstate/foreign travel in aid of a racketeering enterprise, and in 2010, he was convicted of obstruction of justice.  That conviction stemmed from the fact that he had been charged with false statement on a criminal history consent form in connection with the purchase of a firearm—even far after he had been prohibited from possessing any firearms and showcasing his persistent disregard for the law.  (*Id.* at 19-21.) He had multiple additional arrests, including for other assaultive conduct.  (*See id.* at 21-22.)

Having been arrested in December 2019 upon a criminal complaint in Maryland and subsequently charged with Wire Fraud, Defendant was also charged in July 2020 in the Eastern District of Virginia in a five-count Indictment with four counts of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. § 922(g) and one count of Possession of Body Armor by a Prohibited Person.  On December 18, 2020, Defendant pleaded guilty pursuant to a written plea agreement to one count of Possession of a Firearm by a Prohibited Person from that Virginia case (transferred to Maryland) and one count of Wire Fraud in violation of 18 U.S.C. § 1343.

## II.      Advisory Sentencing Guidelines Calculation

As outlined in the PSR, with respect to the fraud conviction (GJH-20-0171), the base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1), because 18 U.S.C. § 1343 is referenced to Section 2B1.1 and has a maximum statutory term of imprisonment of 20 years.  A 14-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the loss amount was at least approximately $658,866.92, as outlined in the SOF and PSR and summarized above.  These figures total to an adjusted offense level of 21.

With respect to the firearm conviction (GJH-20-0368), the base offense level is 14, per U.S.S.G. § 2K2.1(a)(6)(A), because Defendant was a prohibited person when he committed the instant offense by virtue of his convictions for Murder in the Second Degree, Assault with Intent to Murder, Rape, or Rob, and Use of a Handgun/Crime of Violence.  The base offense is increased by 2 levels because the offense involved four firearms.  U.S.S.G. § 2K2.1(b)(1)(A).

Defendant's two convictions yield two separate Groups pursuant to U.S.S.G. § 3D1.2. The fraud Group yields an offense level of 21 (as calculated above), and the firearm Group yields an offense level of 16.  The fraud group is assigned one unit because it is the highest offense level, and the firearm group is assigned a half-unit because it is 5 levels less serious.  *See* U.S.S.G. § 3D1.4(a), (b).  In total, 1.5 units apply to the grouped convictions, increasing the highest offense level by 1 level.  Defendant's combined adjusted offense level is thus 22.

Following reductions from 22 under U.S.S.G. § 3E1.1(a) & § 3E1.1(b), Defendant's final total offense level is anticipated to be **19**.  Per the PSR, because Defendant's criminal history category is I, the sentencing guideline range is **30-37 months' imprisonment**.

Defendant's possession of body armor as a prohibited person also merits the Court's consideration in determining his sentence.  The Sentencing Guidelines require that a plea agreement "containing a stipulation that specifically establishes the commission of additional

11

offense(s)" be treated as if the defendant had been convicted of those offenses.  U.S.S.G. § 1B1.2(c).  It is therefore appropriate for the Court to consider Defendant's possession of body armor under 18 U.S.C. § 931 as if he had been convicted of that offense.  The government requests that the Court do so as another basis for sentencing Defendant at the high end of the Guideline range, as requested below.  *See* U.S.S.G. § 3D1.4(c) (noting that such offenses "may provide a reason for sentencing at the higher end of the sentencing range . . .."); U.S.S.G. § 3D1.4, Application Note 2 (similarly noting courts' latitude to impose such higher sentences).[3]

## ARGUMENT

### I.    The Section 3553(a) Factors and the Government's Recommended Sentence

The government respectfully requests a within-Guidelines sentence at the high end of the applicable advisory Guidelines range, namely 37 months' imprisonment in this case, reflecting Defendant's fraud and firearm misconduct, and a term of supervised release of at least two years (up to the maximum of three years), but no fine.  The government also requests that the Court enter an order for statutorily-required restitution of the $488,976.92 government agencies paid Defendant for his contraband products, and an order for statutorily required forfeiture of Defendant's ill-gotten gains from the wire fraud, in the same amount, as described below.

No less than a 37-month sentence will properly represent the nature and circumstances of Defendant's offenses, his history and characteristics, or the other needs of sentencing in this case.  Over the course of at least five years, Defendant knowingly and repeatedly defrauded the

---

[3]    If the Court accepts the PSR's and the government's Guidelines calculations for the fraud and firearm charges, Defendant's possession of body armor will not be considered in calculating the combined offense level for all charges because the offense level corresponding to body armor possession (10) is 9 or more levels less serious than the Group with the highest offense level (21).  *See* U.S.S.G. § 2K2.6(a); U.S.S.G. § 3D1.4(c).  If the Court determines that the total combined offense level is 18 or lower, however, the body armor possession conduct would be activated as a predicate for increasing Defendant's sentence under U.S.S.G. § 2K2.6(a), and should be considered in that respect.

government by purposely providing goods he knew were sourced from an illicit country of origin. Defendant affirmed no fewer than ten times on SAM—and more times in writing with government officials—that he was sourcing critical security goods from designated countries or manufacturing them himself in Virginia. The government trusted Defendant to provide equipment that would protect Americans and U.S. security partners in Pakistan, El Salvador, Honduras, Mexico, and locations in the United States. In selling the government hundreds of thousands of dollars of equipment it cannot rely on whatsoever or use, and prompting a scramble to pull that equipment from service, Defendant has undercut trust in the supply chains of crucially important protective goods. Given the at-best questionable quality of the goods supplied, as well, Defendant has endangered and continues to endanger security personnel.

Separately, Defendant endangered his community by possessing the firearms, ammunition, and body armor that were seized from his home and elsewhere. As detailed in the PSR, Defendant's history was marked by repeated violent offenses, including his shooting of his then-wife and killing another individual.[4] Defendant disregarded the fact that he was prohibited from owning firearms or body armor and amassed a cache of both, including in his wife's home after she asked him to get rid of them—putting those around him at risk. The nature of this offense, alongside the nature of Defendant's fraud, merit the requested sentence.[5]

---

[4]   The record makes clear that Defendant is not sorry for this inexcusable offense. Even in objections to the PSR, Defendant attempted to justify it by claims of his own victimization.

[5]   Nor was this the only weapons-related criminal activity for which Defendant was under active investigation and which the evidence confirmed. Defendant purchased and sent to a foreign national in Poland a Glock Conversion kit that is specifically classified as a machine-gun part (designed to convert a semi-automatic weapon into a machinegun)—and specifically to evade the U.S. International Traffic in Arms Regulations ("ITAR"). As shown in an e-mail, the foreign national (with whom Defendant had a number of dealings, stated: "I have an ask - by the fuckin ITAR i cannot buy handguard for AK riffle :)  Could U do me a favor and buy it ? (The FDE color)." (Exhibit 12.)  This conduct was described in part in the background to the criminal complaint issued against Defendant in Virginia. (*See* Exhibit 13.)

In particular, the circumstances in which Defendant committed his offenses do not justify any lower sentence.  Defendant had no need to carry on business by defrauding the government, nor to accumulate firearms, corresponding ammunition, and body armor for his personal use, at his home.  In his interview with the probation officer, Defendant claimed that he supplied the contraband equipment in some manner to *support* the troops, based on his own perceived (claimed) judgment of a product's quality apparently years before.  Defendant's appeal to patriotic sentiment, however, is misguided, at best.  A desire to protect the troops does not excuse disregarding the law and providing *prohibited products*—to the detriment of the international trade system and Congressional purposes—and lying repeatedly about doing so.  To the contrary, Defendant hurt the troops by providing products of faulty quality and unknown origin, in particular, as described above.  If Defendant actually saw some superiority in another country's products, he could have suggested this or lobbied for others to test products and see if they agreed with him, but instead he presumed he knew better than the country's entire contracting system and made his own way.

 And his own prior statements belie any such views.  As he wrote to a colleague to encourage him to do the same thing, in Bolivia, he made clear that the goal was simply to make money—at the explicit expense of quality—and that this was, in Defendant's view, a game:

> Dear [Individual 1]:
> It appears to me that if you wish to be selling security products and services to your government on a long term basis, as you have indicated, you need to implement a more creative and dynamic strategy to be able to overcome all the political and bureaucratic obstetrical [sic] that you are encountering.  In my opinion you need to be willing to invest a little money and learn to "think out of the box."
> Key issue -"Origin of goods"
> Solution - Open a Warehouse office in Buenos Aires. We will ship our goods to you there. We support you with OEM and private labeling and guarantee the highest of quality.
> You brand them as a [Company name] product , manufactured in Argentina.

> You sell them direct to the Government
> From that point on all you products are manufactured in Argentina.
> Banking - setup a [Company name] Bank Account in Buenos Aries - moving
> money around from Argentina is much easier than Bolivia. . . .

The Bolivian individual asked Defendant:  "Please send me arguments to have ready for when

they attack our Chinese origin of goods.  Do they comply with an international standard?  Do

you have an international customer list that you can share?  Any information will be welcome."

Defendant made *no reference at all* to any purported positive quality, despite this having been

the second time the Bolivian individual requested that.  Instead, he replied:

> Hey [Individual 1]:
> what you fail to understand, all the competition is also selling Chinese, no matter
> who the location of the company is.
> **the Mexican company is also selling Chinese, he is offering  cheaper ,because**
> **he will be selling lower quality - that cosmetically looks the same.**
> **We can sell cheaper too, if you want to sell cheaper quality.**
> If you recall in our earlier conversation we were going to sell you and you were
> going to present it as a [Company name] product.
> **You need to play the same game that everyone else is.**
> You say we have won the helmets & the shields - if that is confirmed , I will
> reduce the order another $50,000.00 if you can guarantee that we have that order
> locked in.
> We can worry about other thins [sic] as we progress . . . .

(Exhibit 6 (emphases added).)  Far from supporting any assertion regarding quality of products,

therefore, the evidence is to the contrary.

Indeed, law enforcement interviewed contracting officers and representatives of two

contractors who were the next lowest bidders for contracts Defendant won with his illicit goods,

and who have described the harms that came to their companies from *not* playing Defendant's

game.  (Exhibits 7, 8, 9, 10.)  Beyond his guilty plea in this case, the government is concerned by

Defendant's statements in response to the PSR and otherwise that continue to purport to justify

his actions or seem to blame others for things *he* did.  Even SEG's website now proclaims, as the

PSR notes, that it closed "due [t]o factors beyond our control."  (Exhibit 11; PSR at 25.)

15

The requested 37-month sentence is also appropriate in light of the need to deter future conduct like Defendant's and to accomplish the other purposes of sentencing.  In addition to degrading trust in supply chains as described above, Defendant disregarded a clear national policy favoring trade with particular partners.  As noted above, the federal government enacted the TAA in order to encourage trade liberalization and integration among certain countries and to protect American trade.  To grant leniency to an individual who attempted to escape notice in supplying more than $650,000 of illegally-sourced security goods to the government would only encourage others to do the same, further weakening trust in a vital procurement relationship and destabilizing an unmistakable federal policy in favor of specific trading partners and practice.

It is also necessary to deter *Defendant* from the approach he took to fulfilling his contract with GSA.  Again, Defendant justified his actions in his interview with Probation with references to a noble motive:  protection of U.S. servicemembers.  But if he had had any such motive and thought Chinese products were superior, he could have solicited their inclusion and use; he would not have had all the reasons he obviously did to lie about the origin and sneak them into military use for his personal profit.  Defendant's hubris in purporting to supplant federal law with his own view of what is best for the women and men who protect the nation, even if credible, is no defense.  Whether in fraud schemes or firearm possession—both of which are at issue here— the Court should not countenance Defendant's insistence upon taking the law into his own hands.

As explained in the calculation of the applicable Sentencing Guidelines offense level above, the government encourages the Court to consider Defendant's illegal possession of body armor in deciding on an appropriate sentence, as well—not to mention his firearms-and-ammunition and obstructive and combative conduct otherwise in this case.  *Accord, e.g.*, *United States v. Alderman*, 565 F.3d 641, 644 (9th Cir. 2009) (noting that "as with guns and domestic

strife, Congress determined that felons and body armor "are a potentially deadly combination nationwide"). Three of the four locations law enforcement searched in 2019 revealed pieces of body armor, including nearby to firearms and ammunition and being kept with no relationship to the performance of his business. A sentence of 37 months is necessary to appropriately reflect the severity of Defendant's alarming conduct taken as a whole.

## II.    The Loss Amount Associated with Defendant's Fraud Conviction Is At Least $658,866.92, and, Specifically, At Least $673,099.92

The applicable advisory sentencing Guidelines provide for incremental offense-level increases for "loss" exceeding $6,500, U.S.S.G. § 2B1.1(b)(1), and application notes lay out the general rule requiring the Court to consider "the greater of actual loss or intended loss" as the loss amount. U.S.S.G. § 2B1.1, Application Note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, Application Note 3(A)(i). "'Intended loss' (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.*, Application Note 3(A)(ii). "Reasonably foreseeable" harm includes harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, Application Note 3(A)(iv).

Loss calculations also include the costs of making substitute transactions and handling or disposing of the product delivered in product substitution cases, and the reasonably foreseeable administrative costs of repeating or correcting a procurement action in procurement fraud cases more generally. Application Note 3(A)(v)(I), (II). Specially, as the application notes provide:

(I) **Product Substitution Cases.**—In the case of a product substitution offense, the reasonably foreseeable pecuniary harm includes the reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered, or of retrofitting the product so that it can be used for its intended

purpose, and the reasonably foreseeable costs of rectifying the actual or potential disruption to the victim's business operations caused by the product substitution. (II) **Procurement Fraud Cases.**—In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correct the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable.

U.S.S.G. 2B1.1, Application Note 3(A)(v)(I), (II).

The government must establish loss by "'only a preponderance of the evidence,'" *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003), and "the [C]ourt need only make a reasonable estimate of the loss" for sentencing purposes, U.S.S.G. § 2B1.1, Application Note 3(C).

Based upon the facts outlined above, the loss amount in this case is at least $658,866.92—the value of the orders the government placed with Defendant based upon Defendant's fraud—because that sum is the amount of loss Defendant intended to inflict on the government. *See, e.g.*, *Miller*, 316 F.3d at 504 (noting that "the amount billed is the amount that is intended to be paid"). This is also consistent with such cases as *United States v. Wynn*, 684 F.3d 473, 481-82 (4th Cir. 2012), in which the Fourth Circuit affirmed the provision of the full amount of contract payments/invoices from a fraud scheme as the loss amount, as "a reasonable estimate of the loss attributable to the fraud"—and, in fact, as undercounting the fraud loss because it did not count consequential damages.

In this case, as well, for Order No. M0068118F0273, the U.S. Marine Corps not only had been billed (but did not ultimately pay, due to issues with the delivered items) $35,905 to SEG, but then had to pay $50,138 to procure vests in place of those. Accordingly, under the application notes, the amount of $50,138 minus $35,905, namely $14,233, is also appropriate to consider as to Defendant's loss—but it does not increase the applicable offense level. Accordingly, though, the loss amount here should properly be **$673,099.92**. Especially given

Defendant's enthusiasm to "sell cheaper" by selling "cheaper quality," (Exhibit 6), such costs were certainly foreseeable to him.   (Additional orders will naturally require replacement, as well, but the government is not currently seeking delay of the sentencing (or restitution order, discussed below) in that connection due to the unknown time-frame of the efforts.)

As the Second Circuit aptly reasoned in a case involving a failure to comply with government-contract specifications (by, in that case, conducting testing other than what the government required), there can be no mitigation in the loss amount for present purposes:

> To the extent defendant adduced evidence that the tests performed by Raytel were as clinically sound as the tests required by Medicare, this fact does not mean that the government sustained no loss from the charged fraud.  Canova's fraudulent representations did not, after all, pertain to the clinical value of the tests performed, *see* U.S.S.G. § 2F1.1, cmt. n. 3(a); they pertained to the particular test specifications being performed, *see id.*, cmt. n. 3(c).  *When a party fraudulently procures payment for goods or services by representing that they were produced or provided according to certain specifications, it is not the task of a sentencing court to second-guess the victim's judgment as to the necessity of those specifications.*  Whether the testing time on a pacemaker, the number of rivets on an airplane wing, or the coats of paint on a refurbished building is a matter of necessity or whim, the fact remains that the victim has been induced to pay for something that it wanted and was promised but did not get, thereby incurring some measure of pecuniary "loss."  *See United States v. Bhutani*, 266 F.3d 661, 670 (7th Cir.2001) (ruling that loss calculation did not depend on whether defendant's fraudulent adulteration of a drug in fact had an adverse medical effect; "there was a loss because consumers did not get what they bargained for"); . . . *Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 244, 129 N.E. 889, 891 (1921) (Cardozo, J.) (explaining that doctrine of substantial performance is available only to "the transgressor whose default is unintentional and trivial"; by contrast, "[t]he willful transgressor must accept the penalty of his transgression.  For him there is no occasion to mitigate the rigor of implied conditions." (citations omitted)).

*United States v. Canova*, 412 F.3d 331, 352 (2d Cir. 2005) (proceeding to analyze loss in terms of gain and other factors where it was difficult otherwise to determine).  *See also, e.g.*, *United States v. Castner*, 50 F.3d 1267, 1276 n.7 (4th Cir. 1995) ("The government may, of course, contract for parts with more stringent material specifications than are standard to the trade, and is entitled to receive precisely what it requested under the contract." (citing *Blake Constr. Co. v.*

*United States*, 28 Fed. Cl. 672, 688-89 (1993) (government may even contract for snowmen in August)); *id.* at 1275-76 ("Although Appellants maintain that the Navy received materials of the same quality as were bargained for in the contract, the fact remains that Appellants were aware . . . that the contract called for OEM-approved parts.  GRI did not supply OEM-approved parts.  Without the Navy's approval, SEI had no authority to substitute unapproved parts from GRI, thus, its argument concerning lower costs and faster supply time is irrelevant.  The district court correctly determined that the Navy did not receive what it bargained for under its contract . . . .").

Applying the full value of the orders is consistent with the unique nature of the TAA and its purposes, as well—akin to government set-aside or grant contracts designed to assist specific groups.  By the TAA, the government requires products from specific countries in order to encourage other countries to join trade agreements and engage in fair trade practices, among other reasons.  Accordingly, contracts that are fulfilled in contravention of those goals—such as based on Defendant's fraud—divert from those inherent purposes.  Thus, this case is analogous to loss decisions in the Small Business Administration contract arena, given the interests at stake.  Specifically, those cases have supported applying the full value of contracts to "loss" because:

> Despite the Defendants' argument that the government benefitted from the contract rather than losing from it, Congress has emphasized that there is a concern in ensuring that small businesses have a fair proportion of federal contracts because of the benefit that the nation receives from having a strong class of small businesses. . . .  By defrauding the government to obtain the contract, the Defendants prevented the government from awarding the contract to a legitimate small business, and therefore, deprived other small businesses of the ability to obtain this contract.

*United States v. Blanchet*, 518 F. App'x 932, 956-57 (11th Cir. 2013) (citations omitted) (collecting cases); *see also, e.g.*, *United States v. Singh*, 195 F. Supp. 3d 25, 29 (D.D.C. 2016).  In that context, as here, Defendant injured individuals supplying products from designated countries and diverted funds to illicit purposes—supporting Chinese businesses in violation of

American foreign policy and the TAA—and he intended those losses. *See also, e.g.*, *United States v. Brothers Constr. Co. of Ohio*, 219 F.3d 300, 318 (4th Cir. 2000) (counting loss as the full contract amount that had been designated for a disadvantaged business enterprise ("DBE"), even though one was in fact the ultimate beneficiary, because "the funds were not put to the *intended use*—to compensate Brothers for its work on the underdrain construction") (emphasis added); *United States v. Leahy*, 464 F.3d 773, 790 (7th Cir. 2006) (noting that "[i]nstead of computing the total 'value of the benefits diverted from intended recipients or uses' in its analysis," the district court had erroneously deducted a supposed benefit provided; it concluded: "Once the district court determined that this was a case involving diversion of government benefits, however, it was bound to follow the application note that governed this situation.").

Here, Defendant's Chinese-sourced goods are unacceptable not only because at least some were and others may be technically unsound—and all were subject to Defendant's false labeling and violations of the TAA which render them still contraband—but because they violate explicit Congressional policy, to the terms of which Defendant agreed when he signed and regularly refreshed his contract with GSA.  Congress ordered the President in the TAA not to accept goods originating in non-designated countries (including China) "in order to encourage additional countries to become parties to the [relevant World Trade Organization] Agreement and to provide appropriate reciprocal competitive government procurement opportunities to United States products and suppliers of such products."  19 U.S.C. § 2512(a)(1); *see also* S. Rep. No. 96-249, at 137-38 (1979).  The government's acceptance of Defendant's goods is not only prohibited by quality concerns, but also because to do so would circumvent Congress's mandate and undercut its stated objective of encouraging participation in an international agreement. *Acetris Health, LLC v. United States*, 949 F.3d 719, 723-24 (Fed. Cir. 2020) (noting that "[t]he

TAA was designed to encourage foreign countries to enter reciprocal government-procurement trade agreements" for a variety of reasons, including to avoid discrimination against American-made products, and that "the TAA bars procurement of 'products of'" non-designated countries). The government has therefore received no value from the goods, which it cannot use—and Defendant intended that situation as to each order involved.

Thus, using the total value of the orders placed here—and only that approach—appropriately reflects the "'severity of [the particular] offense," which has long been a key purpose of the loss enhancement regime established by U.S.S.G. § 2B1.1 and its predecessors. *See Castner*, 50 F.3d at 1276 (quoting *United States v. Lara*, 956 F.2d 994, 998 (10th Cir. 1992)). Moreover, although Defendant's conduct was discovered before he could fulfill the entirety of the orders in question (specifically, for the riot gear seized which he nonetheless attempted to get delivered, from jail on the fraud scheme), there is no basis to conclude that he did not intend to complete contract delivery in illegal substituted product. *See, e.g.*, *United States v. Jha*, 613 F. App'x 212, 215 (4th Cir. 2015) (approving the district court's reliance on intended loss in the full amount of a grant application by someone who was not an intended beneficiary of those grants, *e.g.*; "intended loss from Jha's scheme was $500,000 based on Jha's conduct in having drafted the Phase II grant application seeking to secure a grant in the amount of $500,000, using the same information and false representations he used in the prior two grant applications"); *Canova*, 412 F.3d at 353 ("[I]n no case do the Guidelines contemplate the court rewriting the parties' contract to excise specifications paid for but not received and, thereby, concluding that the victim sustained no loss.").

In connection with the PSR, Defendant objected to using the total contract value as intended loss, first by asserting simply that "loss" under U.S.S.G. § 2B1.1 refers to "'harm to the

victim.'" (Def. Obj. Letter at 1 (citing *United States v. Ruhe*, 191 F.3d 376, 391 (4th Cir. 1999)).

Defendant's position reflects only *one* definition of loss, however:  actual loss.  *See* U.S.S.G. §

2B1.1, Application Note 3(A)(i).  But in 2001, two years after the *Ruhe* decision Defendant

relies upon, the Sentencing Commission amended Section 2B1.1 to include *intended* loss

explicitly.  *See* U.S. Sentencing Comm'n, Primer on Loss Calculations Under § 2B1.1(b)(1), 1

(Mar. 2020).  Defendant's citation to *Ruhe* is thus no longer relevant.  Furthermore, a 2015

amendment to Section 2B1.1 confirmed that the Defendant's subjective intent is relevant to

determining intended loss.  *See id.* at 5.  The Application Note thus instructs the Court to

calculate the *greater* of actual or intended loss, measured as the "pecuniary harm that the

defendant purposely sought to inflict."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii).  Here,

Defendant did not intend to be caught and fully intended and sought to inflict loss in at least the

total value of the contraband products:  $658,866.92.  The full amount is, in fact, a fair measure

of harm, even if Defendant's case were applicable—showing the scope of the contraband

products by which Defendant circumvented proper procurement procedures and purposes.

Defendant also claimed in his response to the PSR that even if the total contract value is

the appropriate starting point for a loss calculation, he is entitled to an offset corresponding to the

value of the goods provided.  Because, in his own personal view, he provided goods that

performed (he says) up to the government's standards, Defendant argues that the government has

suffered no loss.  This argument similarly should be rejected, based upon the authority cited

above and otherwise.  Among other issues, Defendant relies upon the Credits Against Loss rule

appearing at Application Note 3(E) to U.S.S.G. § 2B1.1, which provides for reduction to "loss"

based upon "[t]he money returned, and the fair market value of the property returned and the

*services rendered* . . . to the victim before the offense was detected."  U.S.S.G. § 2B1.1,

Application Note 3(E)(i).  By its own plain terms, the Credits Against Loss rule is inapplicable here.  *Cf. United States v. Rouse*, 362 F.3d 256, 262 (4th Cir. 2004) ("In interpreting a guideline, ordinary rules of statutory construction apply. . . .  These rules require us to give the guideline its plain meaning . . . .") (citations omitted); *see Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").  Defendant provided the government with goods, not "services," from a country other than those permitted by his contract and which government agencies cannot use.  *See, e.g.*, *Acetris Health, LLC*, 949 F.3d at 724 (noting that "the TAA bars procurement of 'products of'" non-designated countries).  And this was plainly not the case of money or property "returned," such as by a defendant's attempt to rectify a situation before being caught, *i.e.*, "before the offense was detected."  Accordingly, this commentary does not apply.

Indeed, Defendant's cited cases (upon which Defendant relied in his objection to the PSR's loss calculation, (Def. Obj. Letter at 2)), and others where fair market value was deducted based upon the Credits Against Loss rule dealt emphatically with *services* rendered, and are therefore irrelevant in this case.  *See, e.g.*, *United States v. Kozerski*, 969 F.3d 310, 312-28 (6th Cir. 2020); *United States v. Harris*, 821 F.3d 589, 606 (5th Cir. 2016); *United States v. Martin*, 796 F.3d 1101, 1103 (9th Cir. 2015); *United States v. Sublett*, 124 F.3d 693, 694 (5th Cir. 1997); *United States v. Near*, 708 F. App'x 590, 593-95 (11th Cir. 2017) (research contracts); *United States v. Wadhawan*, No. RDB-17-0250, 2017 WL 4618454, at *3 (D. Md. Oct. 16, 2017). Tellingly, Defendant cited only a single case in his objection applying such principles in the context of goods (discussed below)—and he did not cite any basis for departing from the plain language of the advisory notes or even the provisions pertaining to product substitution cases and

procurement fraud cases, instead.  Because the contraband goods Defendant provided cannot be

properly used and are worthless to the government, they cannot serve as the basis for a loss offset

under U.S.S.G. § 2B1.1 *even if that rule applied.  Accord, e.g.*, *United States v. West*, 2 F.3d 66,

71 (4th Cir. 1993) (finding, even under the prior "actual loss" regime, that the district court

"properly concluded that the government simply did not get what it paid for so that the amount

paid out (or 'the money . . . unlawfully taken') fairly constitutes actual loss under § 2F1.1").

And it makes sense that service contracts would be treated differently, or contracts where

products were used up or expended and a benefit was *retained* to use—not the situation here.

That single case addressing products that Defendant cited in his objection to the PSR also

does not support his position.  Indeed, *United States v. Silver*, 245 F.3d 1075, 1081-82 (9th Cir.

2001), did not apply the Credits Against Loss rule at all, instead dealing (properly) with the

product substitution and procurement fraud-type application notes mentioned above.  But most

importantly, *Silver* also dealt with the Guidelines before the introduction of the concept of

intended loss; it was an "actual loss" case and dealing with an offset after the government had

destroyed (or, apparently, possibly resold) the substitute products offered under the contract.  *Id.*

at 1082.  The loss amount also included—and this was not challenged—the full costs of

obtaining replacement products.  *Id.*  Accordingly, it does not support any reduction in "loss"

from the contract value at issue here.  Ultimately, reading the application notes as Defendant

attempts to do, which would not reflect the government "loss" in this case at all, would render

those notes meaningless as contradicting U.S.S.G. § 2B1.1.  *See Stinson*, 508 U.S. at 38.[6]

---

[6]     As the Eleventh Circuit has also made clear—highlighting that the principle upon which
Defendant purported to rely is simply inapplicable—"[a] credit against loss based on money
returned *is not available for intended loss alone*."  *United States v. Massam*, 751 F.3d 1229,
1233 (11th Cir. 2014) (emphasis added).  To the contrary, the Credits Against Loss rule by its
plain terms only truly comes into play with respect to actual loss, *id.*, and actual loss is not the

Case law interpreting a related rule in the application notes to U.S.S.G. § 2B1.1 further

buttresses the conclusion that Defendant is entitled to no offset for goods the government

explicitly said it did not want.  Application Note 3(F)(v) expressly *forbids* credit against loss for

goods that, for instance:  (a) were fraudulently represented as approved by a government agency;

or (b) required regulatory approval by the government and did not receive it/received it

fraudulently.  By its literal terms, Application Note 3(F)(v) does not apply in this case because

no "regulatory approval" was technically required for the goods Defendant provided (although

certainly such goods are regulated under the Export Administration Regulations ("EAR"),

whenever imported into the United States, which leaves this as an arguable question, at best).

But in applying the rule, Circuits have held it applicable to goods the government did not bargain

for even when no regulatory approval was required.[7]

---

determinative loss here.  Moreover, the application note is in fact geared only towards rewarding
defendants who voluntarily repay losses they have caused and seek to *rectify* frauds, *e.g.*—which
is a far cry from Defendant's conduct where he sought to advance the fraud scheme even from
jail, post-arrest.  *See, e.g.*, *United States v. Maisonet-Gonzalez*, 785 F.3d 757, 763 (1st Cir. 2015)
("Pursuant to the clear language of the Guidelines, in order to be entitled to a deduction in the
loss amount [under this provision], [a defendant] must have restituted the money before either
[another victim] or the government detected the offense"); *United States v. Dullum*, 560 F.3d
133, 138 (3d Cir. 2009) (rejecting application of the note where the defendant "repaid [] money
only *after* the bank detected the fraud, notified him regarding the fraudulent checks, froze his
accounts, and the Secret Service began its investigation"); *United States v. Hartstein*, 500 F.3d
790, 798 n.3 (8th Cir. 2007) ("As a general rule, *repayments* prior to discovery are credited
against loss.  [U.S.S.G.] § 2B1.1 comment. (n.3(E)(i)).") (emphasis added); *United States v.
Wasson*, 251 F. App'x 580, 583 (10th Cir. 2007) (similarly treating the application note in its
proper context of when a defendant attempts to make right on losses *before* fraud is detected);
*United States v. Jeffers*, 108 F. App'x 804, 806 (4th Cir. 2004) (summarizing that the note
provides that credit against loss may be given when money is returned to the victim 'before the
offense is detected,'" and denying credit for a defendant who returned a stolen check only after
the theft had been detected); *Tyson v. United States*, No. 312CR239GCMDCK14, 2018 WL
5636167, at *14 (W.D.N.C. Oct. 31, 2018) (summarizing the rule and rejecting a reduction
where "Petitioner has not shown that any funds or property were *voluntarily* returned to victims
before detection of the fraud").  Accordingly, it is far from applicable in that connection, too.

[7]       *See United States v. Bane*, 720 F.3d 818, 824-25 & n.5 (11th Cir. 2013) (rejecting a credit
for medically necessary oxygen in a case that involved fraud pertaining to that representation,

Even if Defendant were entitled to a loss offset to the extent that the goods he provided to the government may not be *strictly* worthless, any relevant offset in this case must be measured according to the value of the goods *to the government*—even based on the cases Defendant cited. *See, e.g.*, *Harris*, 821 F.3d at 605 ("We conclude that the loss amount [in that case, again, a service contract actually subject to the Credits Against Loss rule that is inapplicable here] should have reflected . . . the contract price less the fair market value of services rendered by the Joint Venture *to the procuring agencies*.") (emphasis added).  Here, the government has received no ascertainable value.  When it learned that the goods Defendant fraudulently provided originated in a country forbidden by the contract and by governing law, the government retired all of those goods still within its possession from service, and sought to have its foreign partners do the same with goods within their control.  The government is currently storing those goods in its possession as evidence, but will either destroy them or return them to Defendant (or someone

---

and imposing the full invoiced amount of loss; noting:  "The dissent contends that Application Note 3(F)(v)(III) applies only to cases in which the good in question cannot be lawfully introduced to the market without prior government approval.  We respectfully disagree.  Neither the application note's plain language nor any of our sister circuits have interpreted it in this limited way"); *United States v. Prosperi*, 686 F.3d 32, 39, 43-44 (1st Cir. 2012) (approving of Application Note 3(F)(v)'s application to the value of concrete provided for construction when the concrete failed to meet contract specifications); *see also, e.g.*, *United States v. Giovenco*, 773 F.3d 866, 870 (7th Cir. 2014) (generally applying the application note); *United States v. Bennett*, 453 F. App'x 395, 396-97 (4th Cir. 2011) (affirming district court decision not to credit amount of loss for work provided by a defendant who posed as a licensed physician in performing drug testing); *United States v. Kieffer*, 621 F.3d 825, 834 (8th Cir. 2010) (affirming district court decision not to credit amount of loss for legal services provided by defendant who posed as a licensed attorney, with no credit for the services' value); *United States v. Curran*, 525 F.3d 74, 76, 82 (1st Cir. 2008) (affirming decision not to award any credit to defendant naturopath for services actually rendered); *United States v. Aronowitz*, 151 F. App'x 193, 194-95 (3d Cir. 2005) (upholding district court's finding that victims suffered monetary loss in the full amount where defendant dentist fraudulently charged for root canals performed (even satisfactorily) by dental assistants); *Boye v. United States*, No. CV 16-6024 (FLW), 2018 WL 6061579, at *2-3 (D.N.J. Nov. 20, 2018), *aff'd*, 810 F. App'x 118 (3d Cir. 2020) (declining to provide credit for services provided that were supposed to have been provided by a licensed professional).

qualified) after the conclusion of these proceedings.  For goods not in its possession, the government is still seeking their return and will treat them the same way; they are a liability, a diplomatic problem, and a threat to the lives of the people who may still be using them.  (*See* Exhibits 1, 2, 3, 4, 7, 8, 9, 10.)  *Accord, e.g.*, *United States v. Bhutani*, 266 F.3d 661, 670 (7th Cir. 2001) ("The medical effectiveness of the drug or its dangerousness after adulteration ought not be the core of the inquiry; rather, the district court was justified in determining that there was a loss because consumers did not get what they bargained for.  We agree with the district court's decision that there was indeed loss to consumers because consumers bought drugs under the false belief that they were in full compliance with the law."); *United States v. Bin Wen*, No. 6:17-CR-06173 EAW, 2018 WL 6715828, at *13 (W.D.N.Y. Dec. 21, 2018) ("[E]ven accepting Defendants' representations about the research performed, the Government still did not receive the benefit for which it had bargained, because UEE's research was not performed by the individuals who were supposed to perform it and was not funded by the entities who were supposed to fund it.  Moreover, the Court agrees with the Government that, in light of the extensive fraud perpetrated by Defendants, their representations about the work that was actually done are of limited value.  Indeed, any value of the so-called 'product' provided by Defendants is questionable given the fraud that permeated the awards."; also noting that the defendants were not intended beneficiaries, in parallel to the situation as to Defendant).

Defendant intended to fulfill the entire amount of $658,866.92 with goods sourced from China in a prohibited manner (misrepresented and providing goods the U.S. government could not procure), in violation of the terms of his contract.  He doubled-down on his effort by repeated lies about the origin of the goods.  $658,866.92 is therefore the amount of intended loss under U.S.S.G. § 2B1.1, and the amount of $14,233 is properly added to reflect the known additional

costs the government was forced to undergo to secure the products it thought it had secured in the first place.  Defendant is entitled to no offset under the Credits Against Loss rule because it applies by its terms only to services, and in any event is inapplicable to this case because, among other reasons, the TAA bars the government from using the goods Defendant provided.[8]

### III.  The Government Is Entitled to Restitution in the Amount of $488,976.92, the Sum Paid to Defendant for the Orders and the Agencies' Resulting Harm

Defendant's conviction for wire fraud under 18 U.S.C. § 1343 entitles the government under the Mandatory Victim Restitution Act ("MVRA") to restitution for the $488,976.92 it paid to him—which represents the continuing harm to the victim government agencies in this case. *See* 18 U.S.C. §§ 3663A(a)(1), 3663A(c)(1)(A)(ii); U.S.S.G. § 5E1.1(a)(1); *United States v.*

---

[8]     The government's approach in this case is also consistent with how loss is calculated in the civil context for violations of the TAA.  *E.g.*, *U.S. ex rel. Liotine v. CDW Gov't, Inc.*, No. 05-33-DRH, 2012 WL 2807040, at *11 (S.D. Ill. July 10, 2012) (rejecting an argument akin to Defendant's and finding:  "[I]f it is proven that CDW-G knowingly sold the government products in violation of the TAA, then the correct measure of damages would be the entire amount paid for those products. . . .  [T]he fact that the goods are purchased from a non-compliant country does not in itself mean that the goods are of any less quality or value, but that is not the interest that the TAA is designed to protect.  The TAA's purposes . . . cannot be accomplished if a party who has come to an agreement with the United States to abide by the TAA and only sell from compliant countries is allowed to knowingly sell from non-compliant countries.") (also concluding:  "CDW-G is not entitled to keep money obtained from the government under false pretenses").  This is consistent with the law in other areas, as well, where the government may strike bargains for multiple purposes and is entitled to the value it bargained for.  *E.g.*, *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 305 (6th Cir. 1998) ("[W]e agree with the government that Midwest's argument in favor of a setoff based on value purportedly received would create a perverse incentive system in which government contractors could endanger the lives of American soldiers by providing substandard materiel, and the Army would be deterred from correcting the danger because it would be forced to bear the cost of any use it received from the substandard goods before their defects were discovered.  We stress that the government did not bargain only for plug-welded brake shoes that could withstand a certain amount of force; they also bargained for the confidence that comes with a product that has been subjected to production testing"—analogous to the bargaining here for TAA-compliance); *United States v. R.J. Zavoral & Sons, Inc.*, No. CIV. 12-668 MJD/JJK, 2014 WL 5361991, at *14 (D. Minn. Oct. 21, 2014) (noting that "in cases in which the defendant fraudulently sought payments for participating in programs designed to benefit a third party, such as small minority businesses, courts have found that the government can demonstrate that it received nothing of value, and that all payments paid to the defendant are recoverable as damages").

*Abdelbary*, 746 F.3d 570, 573 (4th Cir. 2014).  By statute, the amount of restitution owed is the "full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A).  "[T]he government bears the burden of proving a victim's loss by a preponderance of the evidence."  *United States v. Wilkinson*, 590 F.3d 259, 268 (4th Cir. 2010).  Here, as the PSR correctly summarizes, that amount is $488,976.92.  (*See* PSR at 29.)

In contrast to "loss" under the Guidelines, which addresses culpability, "loss" for restitution primarily aims to make the victim whole again.  Secondarily, it aims to punish the wrongdoer for his conduct, "requiring the defendant to return his 'ill-gotten gains to the victims of his crimes.'"  *United States v. Ritchie*, 858 F.3d 201, 214 (4th Cir. 2017); *see Paroline v. United States*, 572 U.S. 434, 456 (2014) ("The primary goal of restitution is remedial or compensatory . . ., but it also serves punitive purposes[.]").  To satisfy these ends, courts base restitution on "actual losses only."  *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017).

Here, the victims' actual loss consists of the $488,976.92 the victim agencies paid to Defendant for goods they cannot use.  Defendant objected to this conclusion in the PSR, claiming again that the goods he provided are of value to the government and thus the government suffered no pecuniary loss.  (*See* Def. Obj. Letter at 5.)  However, again, Defendant's objection is out of step with the law (and, specifically, with the Fourth Circuit's approach to calculating loss for restitution), and disregards the facts that his intentional TAA violations render the goods he provided value-less to the government, even if they were not of dubious quality (at best).  Further, in this case, declining to award restitution would provide Defendant with an inexplicable windfall because he is also slated to have the goods returned to him, such that *he* would also receive back whatever value they might actually have *if* sold legally

to a non-government entity.  In any event, highlighting the MVRA's silence on a method to determine value, the Fourth Circuit has stated that "value" is a "flexible concept to be calculated by a district court by the measure that best serves Congress' statutory purpose" of making a victim whole.  *United States v. Steele*, 897 F.3d 606, 610 (4th Cir. 2018) (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) (internal quotation marks omitted)); *see id.* at 611 ("There is no question that the primary purpose of the MVRA was to ensure that victims are made whole.") (citation and quotation marks omitted).

The government cannot be made whole without a refund corresponding to the amount it paid to Defendant for goods that are worthless (and, in fact, diplomatically damaging) to it.  As explained above, the government cannot use the goods Defendant provided because, even if they *weren't* of questioned quality, their use would affront explicit Congressional programs and values.  It would be flatly inconsistent with the MVRA's restitutionary purpose to credit Defendant with value the government did not receive.  The government therefore requests an order of restitution corresponding to the victims' actual lost property, $488,976.92.[9]

---

[9]      Such an award—and recognition of the losses to the government agencies—is also consistent with the TAA's thwarted purposes in this case, by virtue of Defendant's conduct.  *See, e.g.*, *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010) (noting, in the civil damages context, *e.g.*, that "where the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable . . ."); *Jha*, 613 F. App'x at 215 ("Jha argued that he provided technical research reports in exchange for the award of grant money and therefore the Government did not sustain any loss as a result of his conduct.  However, as the district court determined, the grant money was not paid to Jha in exchange for his research reports, but rather to promote collaborative research between small businesses and research facilities.  Also, as a result of Jha's student stipend scheme, research funds from the Department of Defense allotted for research purposes were instead diverted to Jha's personal benefit.  We find that the district court did not commit error, much less plain error, in finding that Jha defrauded two government agencies and in the determination of the amount of restitution owed.").

Notably, indeed, this amount understates the agencies' actual costs in this case, which included testing and audit costs and the need to secure alternate, useable products—many parts of which are still ongoing.  *See, e.g.*, *United States v. Boggs*, 737 F. App'x 243, 247, 255 (6th Cir. 2018) (affirming the district court's order of restitution "in the amount of $279,650.20, based on the 46 contracts where Boggs supplied non-conforming parts," which included not only "the amount paid on the 46 contracts for which Boggs provided nonconforming parts during the 2010 to 2014 period charged in the indictment, plus the costs of testing and re-bidding").  (As noted above, however, the government does not seek to delay judgment in this case.)[10]

## IV.   Defendant Must Forfeit $488,976.92, the Proceeds Defendant Obtained Directly from Wire Fraud

The government also requests that the Court order Defendant to forfeit $488,976.92, the total amount the government paid to him under the GSA contracts, because this amount represents the direct proceeds of his wire fraud offense:  payments he would not have received absent his lies, *i.e.*, his ill-gotten gains.  *See* 18 U.S.C. § 981; 28 U.S.C. § 2461(c); Fed. R. Crim. P. 32.2(b).  28 U.S.C. § 2461(c) requires that a court "shall order" forfeiture of property when a defendant is convicted of an unlawful act for which civil or criminal forfeiture is authorized.  *See* 28 U.S.C. § 2461(c).  The civil forfeiture statute authorizes forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" as defined at 18 U.S.C. § 1956(c)(7).  *See* 18 U.S.C. § 981(a)(1)(C).  "Specified unlawful activity" under 18 U.S.C. § 1956(c)(7) incorporates the

---

[10]     The sole case which Defendant cited in his objection to the restitution recitation in the PSR, *Near*, 708 F. App'x at 604, is irrelevant, at best—because it involved a service contract where the district court found that the contract not only *did* go to intended recipients but also the government received more benefit in the form of legitimate research under that contract than it received losses; there had simply been some diversion of funds.  *See id.* at 603.

offenses listed at 18 U.S.C. § 1961(1), a list that includes wire fraud under 18 U.S.C. § 1343. Defendant is therefore obligated to forfeit the proceeds traceable to his fraud.

The proceeds traceable to Defendant's wire fraud offense are the $488,976.92 he received in payments under the orders at issue in this case.  The applicable forfeiture statute specifies that, "in cases involving . . . unlawful activities," "proceeds" means all property obtained directly or indirectly from the commission of the offense, and property traceable thereto.  *See* 18 U.S.C. § 981(a)(2)(A).  This definition of proceeds applies to Defendant's commission of wire fraud because wire fraud is an "unlawful activity."  Wire fraud under 18 U.S.C. § 1343 is, in fact, expressly referred to as a "specified unlawful activity" earlier in the same subsection.  *See* 18 U.S.C. § 981(a)(1)(C).  These twin references to "unlawful activity" appear in the same section of the same statute, entitled "Proceeds."  *See* Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202, § 20 (codified at 18 U.S.C. § 981).  The presumption that identical words in the same statute have the same meaning thus applies to "unlawful activity" as used in 18 U.S.C. § 981.  *See Robers v. United States*, 572 U.S. 639, 643 (2014).  Accordingly, Defendant must forfeit $488,976.92, the property he obtained directly through his wire fraud. *See, e.g.*, *United States v. All Funds on Deposit in United Bank of Switzerland, New York*, 188 F. Supp. 2d 407, 410 (S.D.N.Y. 2002) ("'Unlawful activities' is a term of art in CAFRA, at least so far as it pertains to that 'specified unlawful activity' expressly identified in § 981(a)(1)(C) as referring to those unlawful activities defined in 18 U.S.C. § 1956(c)(7)—a category distinguished separately from the numerous other federal criminal violations referenced elsewhere in § 981(a)(1)(C).  With respect to these unlawful activities (which, as noted, include

the illegal currency transfers here alleged), the definition of the forfeitable proceeds is solely

provided by § 981(a)(2)(A), and not in any respect by § 981(a)(2)(B).").[11]

As with respect to the loss amount, there is no basis to deduct any value Defendant may

claim his products actually had or, in that regard, to award "net" rather than "gross" proceeds as

the amount of forfeiture, pursuant to 18 U.S.C. § 981(a)(2)—and Defendant made no objection

pertaining to forfeiture in his objection letter to the PSR.  As applicable here, more fully:  "In

cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health

care fraud schemes, the term 'proceeds' means property of any kind obtained directly or

indirectly, as the result of the commission of the offense giving rise to forfeiture, and any

---

[11]     *See also United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017) ("As Bodouva's counsel conceded at oral argument, there is simply no way to lawfully embezzle funds. Accordingly, the definition of proceeds provided in § 981(a)(2)(A) applies here, and there is no statutory authorization for an offset."); *United States v. Mincey*, 800 F. App'x 714, 730 (11th Cir. 2020) (same, for theft of government property); *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (same, for mail and wire fraud); *United States v. Kenner*, 443 F. Supp. 3d 354, 363 (E.D.N.Y. 2020) (holding that "[b]ecause the Second Circuit has held that wire fraud is 'unlawful activity' under § 1956(c)(7)," the forfeitable proceeds are gross proceeds, namely "'property that a person would not have but for the criminal offense'").

Even separately from the above authority, the civil forfeiture statute provides for deduction of direct costs *only* "in cases involving *lawful* goods or *lawful* services that are sold or provided in an illegal manner."  18 U.S.C. § 981(a)(2)(B) (emphases added).  Such are not the products at issue here, which Defendant also imported into the United States despite their status as items presumptively controlled under the Export Administration Regulations without (to the government's knowledge) obtaining the requisite approvals—and sourced them directly from China to the government in violation of the TAA and foreign policy of the United States. Accordingly, the military equipment in no way resembles goods such as entirely legal securities that are simply abused in bribery and other fraud schemes in the cases that diverge from *All Funds*.  *See, e.g.*, *United States v. Mahaffy*, 693 F.3d 113, 136-37 (2d Cir. 2012) (collecting cases and exploring this distinction).  They are analogous to the untaxed or contraband cigarettes that people cannot appropriately possess, as in *United States v. Hasan*, 718 F.3d 338, 345-47 (4th Cir. 2013) (finding that such products are governed by 18 U.S.C. § 981(a)(2)(A)).  An analogy would be that in the case of a bribe to receive a contract award where legitimate products were nonetheless thereafter provided, net proceeds could be the appropriate measure; but where entire orders were procured by fraud and legally prohibited items are supplied, gross proceeds are at issue, instead.

property traceable thereto, and is not limited to the net gain or profit realized from the offense."

18 U.S.C. § 981(a)(2)(A). The TAA forbids the sourcing for government contracts from non-

designated countries, such as China, such that these are both illegal goods and part-and-parcel of

Defendant's unlawful activity in engaging in his years-long scheme to defraud. He lied,

procured false labels on the products suggesting manufacture in Virginia, and undermined

legitimate competitors and government contracting itself. He thwarted the government's efforts

to provide products to foreign partners that the United States and the partners could trust. And

the harms continue in the lack of re-procurement to date on a number of contracts; security and

military personnel do not have the gear they need.

Nor were these goods Defendant actually manufactured or already had; he was ordering

them specifically in furtherance of each fraudulently-procured order, and he continued to lie in

emails regarding the orders. (SOF at 4-8.) Accordingly, the measure of forfeiture is gross

proceeds. Additional case law mandates this conclusion, as well. *United States v. Farkas*, 474

F. App'x 349, 360 (4th Cir. 2012) (affirming a forfeiture judgment after analysis that included

acknowledging the rule that "funds are considered proceeds and therefore deemed forfeitable if

'a person would not have [the funds] *but for* the criminal offense'") (collecting cases) (citation

omitted).[12] Moreover, since the goods are slated ultimately for destruction or return to

---

[12]     *See also United States v. Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009)
(summarizing a number of cases in finding that "monies paid to a defendant as a result of the
scheme are 'proceeds' subject to forfeiture, *without regard to whether the victim received
anything in return*") (emphasis added); *United States v. Percoco*, No. 16-CR-776 (VEC), 2019
WL 1593882, at *5 (S.D.N.Y. Apr. 15, 2019) (finding that it need not decide which section of 18
U.S.C. § 981(a)(1) applied because "but for" the criminal activity, payments would not have
been made, such that gross proceeds was the appropriate measure of forfeiture); *United States v.
Lindberg*, No. 519CR00022MOCDSC, 2020 WL 4518881, at *3 (W.D.N.C. Aug. 4, 2020)
(following *Farkas* and *Percoco* and "adher[ing] to the 'but for' test in its analysis" to award
forfeiture in the amount of gross proceeds); *United States v. Malik*, No. CR MJG-16-0324, 2018
WL 4575034, at *1 (D. Md. Sept. 12, 2018) ("Consistent with forfeiture's fundamental

Defendant (or a designee), not ordering forfeiture of Defendant's gross proceeds would unduly benefit Defendant when items are returned, giving him double-counting credit for those goods.

## STATEMENT AS TO RESTITUTION, WITNESSES, AND LENGTH OF HEARING

As described above and in the PSR, the government does seek restitution in this case. Specific payment directions would be provided to U.S. Probation or chambers upon request.

The government does not currently intend to call any witnesses at the sentencing hearing in this case, although the government anticipates that two case agents—one from the General Services Administration Office of Inspector General ("OIG") (Robert Rudolph) and one from the U.S. Department of State OIG (Robin Leipfert)—would be available to answer questions, if necessary.  Even with limited witness testimony, the government anticipates that the sentencing hearing should be able to be concluded in approximately 1.5 hours or less.

## CONCLUSION

For the foregoing reasons, the government anticipates that it will respectfully ask the Court to sentence Defendant to a term of imprisonment of 37 months, followed by at least two years of supervised release.  The government also anticipates that it will request the Court to order Defendant to pay $488,976.92 in restitution and order forfeiture in the same amount.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By:    /s/
Elizabeth Wright
Assistant United States Attorney

---

objectives of disgorgement and deterrence, if a defendant would not have derived certain funds or property but for committing the criminal offense, then these assets are 'tainted' for purposes of the statute and are subject to forfeiture[.]").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will provide notice of such filing to all counsel of record.

<div align="center" style="margin-left:50%">

    /s/

Elizabeth Wright
Assistant United States Attorney

</div>